OPTICIANS ASSOCIATION OF
AMERICA, a Pennsylvania
Corporation, Plaintiff,

v.

INDEPENDENT OPTICIANS OF AMER-
ICA, INC., a non-profit corporation of
New Jersey, Robert C. Troast, an indi-
vidual, Alfred Villavecchia, an individ-
ual, A. Villavecchia & Sons, Walter H.
Neubert, Inc., B.D. Kovacs, Optician,
Optical Illusion, Robert C. Troast,
Guild Opticians, Gibba Guild Opticians,
Arthur L. Wells, Rx Optician, Kubick &
Kubick Eye & Ear, Carl H. Bergelt,
Guild Optician, In Sight Optics, Wil-
liam H. Ackerman, Optician, Douglas
R. Manhire, Optician, Gerald A. York,
Optician, Saft Guild Opticians, Law-
renceville Optician, M. Wood, Guild
Optician, Lynch-Wood Opticians, F.
Meserall & Co., Opticians, Defendants.

Civ. A. No. 90-63 (MTB).

United States District Court,
D. New Jersey.

April 18, 1990.

Saidman, Sterne, Kessler & Goldstein Washington, D.C. by Joan L. Dillon, McCarter & English, Newark, N.J. by Roslyn S. Harrison, for plaintiff.

Blum Kaplan, New York City by Steven B. Pokotilow, Anita K. Yeung, Pamela Mandel, Millburn, N.J., for defendants.

## OPINION

BARRY, District Judge.

### I. INTRODUCTION

Plaintiff Opticians Association of America ("OAA") has registered and maintained a group of seven collective marks (the "guild marks") that were intended to be used exclusively by its members. Defendants, former members of the OAA, used these guild marks while they were members of the OAA and have continued to use these marks despite having terminated those memberships. In June 1989, plaintiff demanded that all defendants cease use of the guild marks, but the defendants did not and have not complied.

Defendants Troast and Independent Opticians of America ("IOA"), an organization formed by former OAA members to challenge the rights of the OAA over the guild marks, commenced a proceeding on September 22, 1989 before the Trademark Trial and Appeals Board ("TTAB") of the United States Patent and Trademark Office ("PTO") to cancel several of the guild marks at issue in this action. On January 9, 1990, plaintiff instituted this action alleging infringement, false designation of origin, unfair competition, tortious interference with business relations and fraudulent misrepresentation.

Plaintiff now seeks a preliminary injunction (1) prohibiting defendants from using the federally registered guild marks, Federal Registration Nos. 404,350; 410,748; 622,201; 622,743; 751,449; 842,243; and

the New Jersey service mark registration of "GUILD OPTICIANS" AND DESIGN, registered on July 21, 1983, in Class 101, in the advertising, distribution, or sale of defendants' goods or services; (2) prohibiting defendants from tortiously interfering with plaintiff; and (3) staying the proceeding for cancellation of plaintiff's federal guild mark registrations before the TTAB. The court heard oral argument on February 1, 1990.[1] For the reasons that follow, plaintiff's motion will be denied in its entirety.

### II. FACTS

The OAA was originally organized in 1925 as the Guild of Prescription Opticians of America (the "Guild"), a corporation of the Commonwealth of Pennsylvania. (Hawkins Aff. at ¶ 3; Miller Aff. at ¶¶ 2, 3(d)). In this incarnation, the organization was primarily devoted to promoting the advancement of the science of optics. (Hawkins Aff. at ¶ 3). Membership was specifically restricted to retail optical dispensing firms that were not affiliated with a refractionist, a medical professional that prescribes eyewear. *Id.* As a matter of professional ethics, this prohibition served to prevent even the appearance of a conflict of interest between an optical firm, which fills the eyewear prescription, and a refractionist, assuring patients freedom of choice in shopping for prescription eyewear from an optician. *Id.* at ¶¶ 3, 14.

The Guild and its successor in name registered and maintained guild marks which have been in continuous use. The federally registered marks include: (1) United States Trade Mark Registration No. 404,350 for the collective mark "GUILD OPTICIANS" stylized in Gothic script registered on November 23, 1943 in Class 26, and renewed for a twenty year term on November 23, 1983; (2) United States Trade Mark Registration No. 410,748 for a collective mark comprising the words "GUILD OPTICIANS" and a circular design including a stylized "Rx" symbol, registered on De-

---

1. References to the transcript of the argument before this court will be denoted by (Tr. at ——).

cember 19, 1944 in Class 26, and renewed for a twenty year term on December 19, 1984; (3) United States Collective Mark Registration No. 622,201 for a mark comprising the words "GUILD OF PRESCRIPTION OPTICIANS OF AMERICA" and a circular design including a stylized "Rx" symbol, registered on February 28, 1956 in Class 26, and renewed for a twenty year term; (4) United States Trade Mark Registration No. 622,743 for a mark comprising the words "GUILD OF PRESCRIPTION OPTICIANS OF AMERICA" and a circular design including a stylized "Rx" symbol, registered on March 6, 1956 in Class 38, and renewed for a twenty year term; [2] (5) United States Collective Membership Mark Registration No. 751,449 for a mark comprising the words "GUILD OPTICIANS" and a circular design including a stylized "Rx" symbol, registered on June 18, 1963 in Class 200, and renewed for a twenty year term on June 18, 1983; and (6) United States Collective Membership Mark No. 842,243 for a mark comprising the words "GUILD OPTICIANS INTERNATIONAL" and an oval design including a stylized "Rx" symbol superimposed over the intersection of circular depictions of the continents in the Western and Eastern hemispheres of the globe. *Id.* at ¶ 6 & Exh. 3; Shaw Aff. at ¶ 4 & Exhs. 2–6. In addition, the organization registered and maintained New Jersey Service Mark "GUILD OPTICIANS" AND DESIGN, registered on July 21, 1983 in Class 101. (Hawkins Aff. at ¶ 6 & Exh. 3). Plaintiff contends that these guild marks, with the exception of Federal Registration No. 622,743,[3] have served as both collective membership marks and collective trademarks. (Hawkins Aff. at ¶¶ 6, 11; Shaw Aff. at ¶ 5; Miller Aff. at ¶ 4(i); Tr. at 48).

In 1972, the Guild changed its name to the Opticians Association of America and thereafter expanded its mandate to become a trade organization with the goals, *inter alia,* of fostering a broader understanding and acceptance of retail optician dispensing and providing physicians and the public with efficient optical dispensing services through its membership. (Hawkins Aff. at ¶¶ 4, 5 & Exhs. 1, 2; Shaw Aff. at ¶ 2 & Exh. 1; Miller Aff. at ¶¶ 2, 3(d)). This expansion was memorialized in the modification of the Constitution and Bylaws,[4] by which membership was opened to optical firms that were affiliated with refractionists. (Hawkins Aff. at ¶ 8). The shift in policy was motivated primarily by a desire to admit to membership and, consequently, to represent a wider spectrum of opticians in order to become a viable force in promoting national legislation. (Miller Aff. at ¶ 3(a); Troast Aff. at ¶ 6). In addition, the transmogrification was, in part, an acknowledgement of the increasing trend toward "one-stop" shopping for prescription eyewear and a perception that new regulations promulgated by the Federal Trade Commission would be more effective in ensuring the freedom of the public to make an informed choice regarding an eyewear provider. (Hawkins Aff. at ¶ 14).

Despite this change, the OAA did not completely jettison the more stringent professional standards that had previously existed. In response to the concerns of a vocal minority of members, the OAA established a separate division within its membership, appropriately entitled the Guild of Prescription Opticians of America (the "Guild Division"), that pledged to continue the tradition of conducting business in the absence of an association with refractionists. *Id.* at ¶ 9. Accordingly, membership in the Guild Division was limited to retail

---

**2.** The design of Federal Registration No. 622,743 is identical to that of Federal Registration No. 622,201. The only distinction between the marks is the designation under which each was registered.

**3.** Although failing to specify the function served by Federal Registration No. 622,743, plaintiff appears to treat it solely as a collective trademark, a conclusion consistent with plaintiff's position at oral argument. (Tr. at 48). Federal

Registration No. 622,743 is not a collective membership mark because plaintiff explicitly distinguishes it from the other guild marks which *are* purported to be collective membership marks. (Hawkins Aff. at ¶ 6).

**4.** The complete text of the OAA Constitution and Bylaws may be found at Exhibit 2 to the Hawkins affidavit and at Exhibit 1 to the Shaw affidavit.

optical dispensing firms that remained members in good-standing of the OAA and, in addition to other accreditation requirements, eschewed affiliation with refractionists. *Id.;* OAA Const. at 19.

Although the Guild Division is a distinct group of OAA members governed by an elected, representative body—the Guild Council—direct control over this group is maintained by the OAA. While the members of the Guild Division may create standards and guidelines for membership and accredit members, the final authority on determining membership in the Guild Division is the Board of Directors of the OAA. (Shaw Aff. at ¶ 6 & Exhs. 7–9; OAA Const. at 22). Moreover, the five-person committee which nominates slates of candidates to fill expired terms on the Guild Council is appointed by the President of the OAA, subject to the approval of the Guild Council. (OAA Const. at 21). Finally, the OAA controls the percentage of OAA revenues allotted to the Guild Division and, thus, its operating budget. (Shaw Aff. at Exhs. 37, 43, 54, 59, 61).

The Constitution and Bylaws of the OAA specify that the guild marks are owned by the OAA and may be used only by optical dispensing firms that have been accredited by the Guild Council and are members in good standing of the OAA and the Guild Division. (OAA Const. at 19). There is no other reference in the OAA Constitution and Bylaws to the authority of Guild Division members to use the guild marks; indeed, the only evidence submitted by the parties concerning the right to use the guild marks is one reference in a June 1989 policy statement of the OAA Board of Directors. (Shaw Aff. at ¶ 9 & Exh. 13).

Extensive use is made of the guild marks. The Guild Division provides its members with large decals suited for windows or doors of the optical firm and membership certificates emblazoned with one of the guild marks. (Fairbarns Aff. at Exhs. B, D). The Guild Division members themselves adorn stationery, promotional material, prescription blanks, business cards and receipts with the guild marks. (Hawkins Aff. at Exh. 69). The guild marks are also used by Guild Division members on a variety of signs and in telephone book listings and advertisements. *Id.*

The wide public circulation of the guild marks has engendered recognition by eyewear prescribers and eyewear consumers, leading them to distinguish Guild Division opticians from other opticians. Ophthalmologists direct patients to Guild Division opticians because of fine workmanship, professional integrity, and strong beliefs concerning the separation of the eyewear prescribing function from the eyewear dispensing function. (Caputo Cert. at ¶¶ 3–4; Smith Cert. at ¶¶ 3–4; Fonda Cert. at 4–5). Eyewear consumers frequent Guild Division opticians because of ease of accessibility, personal attention, professional service, fine workmanship, and comfort instilled by the knowledge that the optician has no relationship with a refractionist. (Foster Cert. at ¶¶ 4–5; McCarthy Cert. at ¶¶ 4–5; Reisman Aff. at ¶¶ 6–7).

Despite the lofty goals of the Guild Division, certain of its members were dissatisfied with the manner in which the stringent standards were upheld. (Hawkins Aff. at ¶ 13; Troast Aff. at ¶¶ 6–8). Defendants Villavecchia and Troast, among others, were concerned that membership in the Guild Division was secured and maintained by optical firms simply through an averment in an affidavit as to lack of affiliation with a refractionist, rather than an investigation and inspection of the firms to ascertain compliance with accreditation requirements. (Troast Aff. at ¶ 6; *see* Hawkins Aff. II at Exh. 1). Furthermore, these Guild Division members were disturbed that the OAA did not follow recommendations of the Guild Council to terminate the membership of some Guild Division members who, subsequent to becoming members, initiated affiliations with refractionists. (Troast Aff. at ¶ 7). Finally, there was dismay that the OAA exercised neither a uniform nor effective policy to verify that use of the guild marks had been discontinued by optical firms that were no longer members in good standing of the OAA and the Guild Division. *Id.* at ¶¶ 7–8.

In frustration at this perceived lack of concern by the OAA, defendants Villavecchia and Troast became active in the Guild of Prescription Opticians of New Jersey (the "New Jersey Guild"), an affiliate of the Guild Division, and used that organization to advocate greater autonomy from the OAA for the Guild Division and more vigorous enforcement of the Guild Division's strict standards. (Hawkins Aff. at ¶ 13 & Exhs. 34, 36–66). Thereafter, Villavecchia and Troast terminated their membership in the OAA and the Guild Division. (Troast Aff. at ¶ 8; see Hawkins Aff. at Exh. 65). On June 2, 1989, the OAA revoked the affiliate status of the New Jersey Guild for the failure of all of its members to remain members in good standing of the OAA. (Hawkins Aff. at Exh. 35; Shaw Aff. at ¶ 14 & Exh. 15). At about the same time, all the other defendant optical firms stopped paying dues to the OAA and were terminated from membership. (Villavecchia Tr. at 91). The OAA advised the New Jersey Guild, as well as all the defendant optical firms, to cease use of the guild marks by July 3, 1989. (Hawkins Aff. at Exhs. 4–22, 35).

In response, Villavecchia and Troast formed the IOA to seek a legal determination of the rights of the OAA over the guild marks and to file applications to use the guild marks as certification marks. (Villavecchia Tr. at 62, 84; Troast Aff. at ¶ 8). Accordingly, as noted earlier, Troast and the IOA have instituted a cancellation proceeding encompassing the majority of the guild marks before the TTAB of the PTO. (Hawkins Aff. at ¶ 23 & Exh. 70). The IOA has also filed an application with the PTO to register certain of the guild marks as certification marks. (Pl. Rep. Br. at Exh. L) All defendants have ignored the cease and desist deadline of July 3, 1989 and have continued to use the guild marks after termination of their memberships in the OAA and the Guild Division. (Hawkins Aff. at ¶¶ 16, 26 & Exh. 69).

**5.** Plaintiff does not distinguish the New Jersey collective mark from the six federally registered collective marks for the purpose of its preliminary injunction application, and concedes that

## III. DISCUSSION

A party seeking a preliminary injunction is required to produce sufficient evidence to convince the court that: (1) the movant has shown a reasonable probability of success on the merits; (2) the movant will be irreparably injured by a denial of such relief; (3) granting preliminary relief will not result in even greater harm to the non-moving party; and (4) granting preliminary relief will be in the public interest. *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir.1987); *SI Handling Systems, Inc. v. Heisley*, 753 F.2d 1244, 1254 (3d Cir.1985).

A plaintiff will only prevail on a statutory or common law trademark or service mark claim by establishing that: (1) the marks are valid and legally protectible; (2) the marks are owned by plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services. *Pedi-Care, Inc. v. Pedi-A-Care Nursing Inc.*, 656 F.Supp. 449, 453 (D.N.J.1987); *Holiday Inns, Inc. v. Trump*, 617 F.Supp. 1443, 1464 (D.N.J. 1985); *see Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1228 (3d Cir.1978). The parties do not contest the fact that plaintiff owns the seven guild marks. The critical issue is the validity of those seven marks.[5]

As an initial matter, plaintiff contends that by virtue of the doctrine of licensee estoppel defendants may not challenge the validity of the guild marks. A former licensee is estopped from disputing the validity of the licensor's trademarks based upon facts which arose during the course of the license. *Professional Golfers Ass'n v. Bankers L & C Co.*, 514 F.2d 665, 671 (5th Cir.1975); 3 Callmann, *Unfair Competition, Trademarks & Monopolies* § 19.48 (4th ed. 1983); 1 McCarthy, *Trademarks and Unfair Competition* § 18:20 (2d ed. 1984). Plaintiff argues that because the facts upon which defendants'

all seven guild marks should be treated as if they were federally registered collective marks. (Tr. at 48).

claim of invalidity is based arose during the course of membership in the Guild Division, a purported licensing relationship, defendants are consequently estopped from challenging the validity of the guild marks. Such an argument does not merit serious attention.

The doctrine of licensee estoppel is triggered only by the existence of a licensing relationship. 1 McCarthy, *Trademarks and Unfair Competition* at § 18:20; *see Professional Golfers Ass'n, supra.* Plaintiff has presented no evidence which even suggests that a written or oral licensing agreement ever existed between the OAA and any of the defendants. The only guidelines concerning the authority of the Guild Division members to use the guild marks are contained in the OAA Constitution and Bylaws and the June 1989 policy statement by the OAA Board of Directors. These fleeting references simply note that use of the guild marks is predicated upon accreditation by the Guild Council and membership in good standing with OAA and the Guild Division, and certainly do not constitute a written licensing agreement.

Even absent a formal licensing agreement, a sufficient licensing relationship may, nonetheless, be found based solely upon a status of affiliation between the owner of the trademark, a national organization, and the user of the trademark, a local chapter of that national organization. *United States Jaycees v. Philadelphia Jaycees,* 639 F.2d 134, 139 & n. 7 (3d Cir. 1981). Far from being an autonomous affiliate of the OAA, however, the Guild Division is merely a sub-group of OAA members distinguishable from the general membership only on the basis of its professional standards and, consequently, its use of the guild marks. The OAA exercises direct control over the membership composition, the governance structure and the finances of the Guild Division. As plaintiff acknowledges, the Guild Division's relationship to the OAA is no different than that of the Military Opticians, a special category of membership for active duty military opticians. (Shaw Aff. at ¶ 7). Because no licensing agreement, either explicit or tacit, and no licensing relationship, apart from any agreement, has existed between the Guild Division and the OAA regarding the guild marks, a challenge to the validity of the guild marks will not be defeated by the doctrine of licensee estoppel.

■ The validity of the guild marks depends, purely and simply, upon whether plaintiff has properly characterized the marks. With the exception of Federal Registration No. 622,743, exclusively a collective trademark, plaintiff maintains that the guild marks are serving as both collective membership marks and collective trademarks. A collective mark is "a trademark or service mark ... used by the members of a cooperative, an association or other collective group or organization ... and includes marks used to indicate membership in a union, an association or other organization." 15 U.S.C. § 1127 (1990).

> Collective marks may be either collective trademarks or collective service marks and are used by the members of the collective to identify their own goods or services and distinguish them from those of non-members. * * * A collective membership mark, on the other hand, has as its sole purpose the indication of membership in the collective organization to which the party displaying the mark belongs.

*In re Int'l Institute of Valuers,* 223 U.S. P.Q. 350, 350 (TTAB 1984); *accord Aloe Creme Laboratories, Inc. v. American Soc. for Aesthetic Plastic Surgery, Inc.,* 192 U.S.P.Q. 170, 173 (TTAB 1976). A collective trademark or service mark is owned by the organization which controls the use of the mark by its members for identification of their goods or services, but does not use the mark itself. *Huber Baking Co. v. Stroehmann Bros. Co.,* 252 F.2d 945, 952 (2d Cir.), *cert. denied,* 358 U.S. 829, 79 S.Ct. 50, 3 L.Ed.2d 69 (1958); *Aloe Creme Laboratories, supra,* 192 U.S.P.Q. at 173; *see* TMEP 1303.03. However, while a collective membership mark is similar in that it is owned by the collective and regulated for the use of membership identification, it is unique to the extent that it may also be used by the group as a trademark or service mark. *Saks & Co. v.*

*Snack Food Ass'n*, 12 U.S.P.Q.2d 1833, 1835 (TTAB 1989); *see* TMEP 1304.02.

Defendants, on the other hand, contend that the guild marks are more properly certification marks. A certification mark is "any word, name, symbol, or device or any combination thereof ... used by a person other than its owner ... to certify ... quality, accuracy, or other characteristics of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization." 15 U.S.C. § 1127 (1990).

> The message conveyed by a certification mark when it is applied to goods or used in connection with services, is that the goods or services have been examined, tested, inspected, or in some way checked by a person who is not their producer, by methods determined by the certifier/owner. The placing of the mark on goods or its use in connection with services thus constitutes a certification by someone other than the producer that the characteristic, or the requirement, to which the mark pertains exists, or has been met.

TMEP 1306.01. Like collective trademarks and service marks and, consequently, unlike collective membership marks, a certification mark may not be used by its owner. The owner of the certification mark merely authorizes other persons to apply the mark to their goods and services. TMEP 1306.-01; *American Speech–Language–Hearing Ass'n v. Nat. Hearing Aid Soc.*, 224 U.S.P.Q. 798, 806 (TTAB 1984); *In re Monsanto Co.*, 201 U.S.P.Q. 864, 868–69 (TTAB 1978).

The guild marks cannot function both as collective marks and as certification marks because such characterizations are mutually exclusive. *In re Florida Citrus Comm'n*, 160 U.S.P.Q. 495 (TTAB 1968); J. Hawes, *Trademark Registration Practice* § 9.03 (1989); *see* TMEP 1304.02; TMEP 1306.01; TMEP 1306.06(a); *American Speech–Language–Hearing Ass'n, supra*, 224 U.S.P.Q. at 807–8. A certification mark serves as a seal of approval for or a guarantee of compliance with a uniform standard. *See* 3 Callmann, *Unfair Competition, Trademarks & Monopolies* at § 17.18. A collective mark, however, serves as an inalienable characteristic of self-identification for that which sports the mark, akin to a patronymic, designating genesis or indicating origin. More specifically, a collective membership mark is a membership badge or a designation of associational origin. *See* TMEP 1304.02; TMEP 1304.03. Correspondingly, a collective trademark or service mark is an indication of the specific commercial source of the goods or services. *See* TMEP 1303.

The characterization of a mark is necessarily predicated upon the manner and context in which it is used, as revealed by the specimens and other literature of record, and the significance which it is likely to have to members of the public because of the manner in which it is used. *In re Institute for Certification of Computer Professionals*, 219 U.S.P.Q. 372, 373 (TTAB 1983). Because use, rather than registration, is the decisive factor, I turn my attention to use of the specimens and the public perception of such use to determine whether the guild marks are serving as collective membership marks and collective trademarks or as certification marks.

Specimen use indicates that the guild marks are not serving as collective membership marks and collective trademarks. Although all the retail optical firms authorized to use the six guild marks purported to be collective membership marks are members of the OAA, not all members of the OAA are permitted to use those guild marks. *See American Speech–Language–Hearing Ass'n, supra*, 224 U.S.P.Q. at 807. Because use of the guild "collective membership" marks is strictly limited to members of the Guild Division, it is axiomatic that they are not used to solely indicate membership in the OAA.

A finding that the guild mark specimens are used only by a distinct subgroup of the OAA does not, in and of itself, invalidate them as collective membership marks. An organization may properly own a collective membership mark over which it retains control where that mark is used

exclusively by a group formed by the organization, even where the membership of the group is independent from that of the organization. *In re Stencel Aero Engineering Corp.*, 170 U.S.P.Q. 292 (TTAB 1971). If an organization can own a collective membership mark used by a group in which there is no duality of membership between the organization and the group, it can certainly own such a mark where use is made by a group comprised exclusively of a portion of its membership that meet special requirements. A notable example of such an arrangement is ownership of the collective membership mark "EAGLE SCOUT" by the Boy Scouts of America.

■ The problem arises where the purported collective membership mark not only fails to identify all members of the owner's organization, but also begins to serve as a sign that certain services performed by the members authorized to use the mark comport with a uniform standard. For example, the mere fact that the collective membership mark "EAGLE SCOUT" may only be used by a Boy Scout who has, *inter alia*, completed a substantial community service project is not significant. However, when coupled with the reality that use of the mark and public perception of that use has evolved to signify performance of a particular quality of community service, EAGLE SCOUT no longer serves exclusively as a collective membership mark. The purported collective membership mark must lose qualities of a collective membership mark *and* assume qualities of a certification mark before its designation will be deemed improper.[6]

■ Likewise, the guild mark specimens do not function as collective trademarks. The membership of the Guild Division is composed solely of retail optical firms that perform the service of filling prescriptions for eyewear. Although theoretically possible, they do not produce or manufacture prescription lenses or frames which are adorned by trademarks. The

guild marks cannot possibly be used to distinguish the eyewear of the Guild Division from that of competitors where the members of the Guild Division produce nothing upon which a guild mark is affixed.

Nonetheless, an objective examination of the actual use of the guild mark specimens does not conclusively indicate that they are serving as certification marks. The members of the Guild Division incorporate the guild marks into membership certificates, decals, eyewear accessories, stationery, promotional material, prescription blanks, business cards, receipts, signage and telephone book listings and advertisements. Such use is generally consistent with the requirement that certification marks be used in connection with the advertisement or provision of services rendered, *see* TMEP 1306.07(c), but is by no means dispositive. *Cf. American Speech–Language–Hearing Ass'n, supra,* 224 U.S.P.Q. at 807.

The OAA, however, resolved any doubt as to its intent to utilize the guild marks as certification marks when it precisely defined that which the guild marks embody. In a promotional brochure entitled "What is the Guild?"—based upon a slide presentation given to eyewear prescribers—the OAA sets forth the distinctive features of membership in the Guild Division and, thus, the ethos symbolized by the guild marks. The brochure does not extol the benefits of the Guild Division's association with the OAA or its professional accomplishments on behalf of its members, eyewear prescribers or the public, but rather provides a guarantee concerning the services performed by Guild Division members:

> *What Sets the Guild Optician apart from others?*
> Legacy of maximum service to the [prescribers'] patients
> Legacy of only providing quality products & services

6. The designation of a mark as a collective membership mark will be deemed improper where the mark *appears* to be serving as a certification mark. *See American Speech–Language–Hearing Ass'n, supra,* 224 U.S.P.Q. at 807–08. The mark need not meet all the requirements for registration as a certification mark before such a determination can be reached.

Adherence to Code of Ethics [7]

Belief in separation of prescribing & dispensing functions

Adoption of standards both for dispensing personnel and dispensing store

(Fairbarns Aff. at Exh. G). Therefore, by its own admission, the OAA acknowledges that the guild marks certify professional independence, service of the highest quality, and compliance with established standards—much like the guild mark of the Middle Ages, a paradigm of the certification mark. 3 Callmann, *Unfair Competition, Trademarks & Monopolies* at § 17.18.

The perception of eyewear prescribers and eyewear consumers concerning use of the guild marks reinforces the conclusion that they are serving as certification marks. Defendants have presented certifications from practicing ophthalmologists who recommend their patients to Guild Division opticians because of high quality workmanship, professional integrity toward the patients, and the independence from a competing refractionist. Likewise, certifications and an affidavit from eyewear consumers establish that they patronize Guild Division opticians because of ease of accessibility, personal attention, professional service, high quality workmanship, and confidence that they will receive eyewear which fulfills their needs due to the absence of a self-interested relationship with a refractionist. Plaintiff does not seriously dispute the general perception of the public that the guild marks signify an optician who is independent, provides quality service, and maintains a high degree of professionalism. The inescapable conclusion, upon review of the use of the guild mark specimens and public perception of that use, is that the guild marks are probably functioning as certification marks.

▪ Because the guild marks are not functioning as collective marks, but seem to be functioning as certification marks, plaintiff has not established that the marks are valid collective marks.[8] *American Speech–Language–Hearing Ass'n, supra,* 224 U.S.P.Q. at 807–08; J. Hawes, *Trademark Registration Practice* at § 903. The failure to establish the validity of the guild marks defeats plaintiff's attempt to show a reasonable probability of success on the merits for preliminary relief on the issues of infringement and unfair competition, and "must necessarily result in the denial of a preliminary injunction." *Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 797, 800 (3d Cir. 1989); *In re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982).

▪ The host of allegations proffered by plaintiff to establish irreparable harm in the event of a denial of preliminary relief are similarly unavailing, whether these allegations be viewed in connection with infringement, unfair competition or tortious interference claims. First, plaintiff claims that defendants' use of the guild marks has caused and will cause irreparable harm in the loss of control over the goodwill associated with those marks. Second, plaintiff charges that defendants' challenge to the OAA's legal rights in the guild marks has

---

7.
*Code of Ethics of the Guild of Prescription Opticians of America*

I. To maintain the highest level of professional opticianry, thereby protecting the consumer's interests.

II. To meet the high standards of the Guild to ensure that efficiency and service are always provided.

III. To furnish a source of eye care products and services, independent of those prescribing for eye care needs.

IV. To promote the conservation of human sight.

V. To supply only the finest quality optical products and services, representing the state of the art in opticianry.

VI. To participate in and encourage continuing education for eye care professionals.
*Id.*

8. I note in passing that if the registrations are invalid and subject to cancellation, plaintiff's common law rights in the guild marks will also be extinguished. Collective marks were unknown at common law and came into existence only as a federal statutory construct. Therefore, common law rights in collective marks do not survive upon invalidation of the federal registrations of those marks. *See Huber Baking Co., supra,* 252 F.2d at 952.

irreparably harmed and will harm the reputation of the OAA. Finally, plaintiff claims that defendants' propaganda concerning legal rights to the guild marks has resulted in confusion amongst plaintiff's members and the possibility of defection of its membership, and will continue to do so.

I reject the loss of good will and reputation claims out of hand. It is clear to me from all that is before me that if the good will heretofore symbolized by the marks, i.e. quality and independence from any association with a refractionist, is being harmed and, consequently, that plaintiff's reputation is being harmed, those harms have been and will continue to be caused not by defendants and not by the denial of an injunction but, rather, by plaintiff itself which, even now, may be moving away from the non-affiliation requirement for membership in the Guild Division. (Hawkins Dep. at 64). And insofar as plaintiff complains of the potential defection of certain of its members and the concomitant loss of revenue from membership dues, such injury is easily quantifiable. Irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it." *Morton v. Beyer*, 822 F.2d 364, 372 (3d Cir.1987); *ECRI v. McGraw–Hill, Inc., supra*, 809 F.2d at 226.

As a final matter, plaintiff seeks a stay of the cancellation proceeding before the TTAB. The power to stay proceedings flows from the power inherent in the court to schedule disposition of the cases on its docket with the goal of promoting fair and efficient adjudication. *Landis v. North American Co.*, 299 U.S. 248, 254, 57 S.Ct. 163, 165, 81 L.Ed. 153 (1936); *Gold v. Johns–Manville Sales Corp.*, 723 F.2d 1068, 1077 (3d Cir.1983). Because this court exercises no control over the docket of the TTAB, it lacks the power to stay its proceedings. The power to stay a cancellation proceeding resides only in the Board itself. *The Other Tel. Co. v. Connecticut Nat. Tel. Co.*, 181 U.S.P.Q. 779, 782 (Com'r 1974); *see* Rule 2.117 (TMRP). Accordingly, the request for a stay of the cancellation proceeding will be denied.

In sum, a preliminary injunction will not issue, plaintiff having failed to establish a reasonable probability of success on the merits of its infringement and unfair competition claims, and having failed to make the required showing of irreparable harm to support injunctive relief on any of its claims. Moreover, because a stay of the cancellation proceeding before the TTAB is beyond my power to grant, plaintiff's request for such relief will be denied.

An appropriate order will issue.