**RINGLING BROS.–BARNUM & BAILEY COMBINED SHOWS, INC., Plaintiff,**

v.

**UTAH DIVISION OF TRAVEL DEVELOPMENT, Defendant.**

**Civil Action No. 96–788–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 27, 1997.

---

Stephen M. Colangelo, John F. Anderson, McGuire Woods Battle & Boothe, LLP, Mc-Lean, VA (Steven B. Pokotilow, Laura E. Goldbard, Stroock & Stroock & Lavan, New York City, of counsel), for Plaintiff.

Jan Graham, Atty. Gen., Jerrold S. Jensen, Ralph L. Finlayson, Asst. Attys. Gen., Salt Lake City, UT, for Defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

ELLIS, District Judge.

This is a trademark dilution suit in which plaintiff, Ringling Bros.–Barnum & Bailey Combined Shows, Inc. ("Ringling") contends

that the use of the mark THE GREATEST SNOW ON EARTH by defendant, Utah Division of Travel Development ("Utah"), has diluted Ringling's famous mark, THE GREATEST SHOW ON EARTH, in violation of 15 U.S.C. § 1125(c).

After completion of discovery and pretrial proceedings, the matter came before the Court for a bench trial on February 10, 1997.[1] There, the parties stipulated various undisputed facts and presented additional testimonial and documentary evidence. Each party presented three witnesses. Testifying for Ringling were a marketing and survey expert, Michael Rappeport, and two Ringling executives, Jeff Meyer, a Ringling employee with co-promotion responsibilities, and Arthur Ricker, Ringling's vice-president in charge of marketing. In response, Utah also presented two executives, Dean Reeder, director of Utah's Division of Travel Development, and Mark Menlove, president of Ski Utah, and its own survey expert, William Weilbacher, who, because of illness, appeared by deposition. After hearing the evidence and counsel's oral arguments, the matter was taken under advisement. Set forth here, pursuant to Rule 52, Fed.R.Civ.P., are the Court's findings of fact and conclusions of law.

## I. FINDINGS OF FACT

1. Ringling is a Delaware corporation, with its principal place of business in Vienna, Virginia.

2. Since the 1870's Ringling and its predecessors in interest have used and been associated with the mark THE GREATEST SHOW ON EARTH.

3. Ringling is the owner of the service mark THE GREATEST SHOW ON EARTH which bears United States Registration No. 724,946. This trademark issued on December 5, 1961, for entertainment services in the nature of a circus. It remains valid and in full force and effect. Ringling also owns other related registrations for the mark THE GREATEST SHOW ON EARTH and THE GREATEST SHOW ON EARTH & Globe

Design for entertainment services as well as products.

4. P.T. Barnum's Circus began using the trademark THE GREATEST SHOW ON EARTH in connection with its circus in 1872. In 1919, Ringling Circus and Barnum & Bailey Circus merged to form Ringling Bros.-Barnum & Bailey Circus. Beginning in 1872 and continuing through the present, Ringling and its predecessors in interest have continuously offered the Circus to the public under the mark THE GREATEST SHOW ON EARTH.

5. Since its inception, Ringling has relied on promotional campaigns using the mark to advertise upcoming Circus performances at a particular location.

6. The tour itinerary of the Circus today, which is similar to the itinerary used in the early years of the Circus, is extensive, taking the Circus, advertised as THE GREATEST SHOW ON EARTH, by rail to cities throughout the United States.

7. Today, the Circus appears annually in major cities for weeks at a time and in smaller cities for two or more days at a time. Approximately 1,000 shows per year are presented to approximately 12 million people in 95 cities. As a result, more than 70 million people each year are exposed to the mark THE GREATEST SHOW ON EARTH in connection with the Circus.

8. Revenues derived from goods and services bearing or using the mark THE GREATEST SHOW ON EARTH, including Circus ticket sales and sales of concession items sold at the Circus are substantial; they exceeded $103 million for the single fiscal year ending January, 1997.

9. The Circus has two units—the Red Unit and the Blue Unit. Each Unit includes feature acts and runs for a two-year season. For example, the Red Unit currently features David Larible and celebrates the 127th edition of RINGLING BROS.–BARNUM & BAILEY's THE GREATEST SHOW ON

---

1. Ringling's jury request was denied for the reasons set forth in a Memorandum Opinion dated February 21, 1997. *Ringling Bros.-Barnum &*

*Bailey Combined Shows, Inc. v. Utah Division of Travel Development,* 955 F.Supp. 598.

EARTH, and the Blue Unit features Airiana, the Human Arrow.

10. The Circus has been an American entertainment event for more than 125 years.

11. Ringling expends substantial effort to ensure that the mark THE GREATEST SHOW ON EARTH is not used in any altered form. It is Ringling's policy that any promotional activities conducted with third parties are subject to Ringling's guidelines, including the requirement that the mark THE GREATEST SHOW ON EARTH may only be used to describe services and products provided by Ringling and may not be used to connote any other entity or event. Thus, Ringling's mark is used only in reference to the Circus.

12. Ringling also monitors the use of its mark or similar marks through an enforcement program, which notifies alleged diluters or infringers of Ringling's trademark rights.

13. Ringling uses a number of techniques for prominently advertising and promoting the Circus by using the mark THE GREATEST SHOW ON EARTH. This advertising and promotion includes print advertising, radio, television, videos, outdoor billboards, direct-mail pieces, press announcements, posters, program books, souvenirs and joint promotions with other companies. In the fiscal year ending January, 1997, expenditures on advertising using the mark THE GREATEST SHOW ON EARTH totaled approximately $19,000,000.

14. Prior to a Circus performance in a city, Ringling advertises in local media using the mark THE GREATEST SHOW ON EARTH. Typically, Ringling begins to advertise the Circus using the mark THE GREATEST SHOW ON EARTH in the print media and on television and radio for two months prior to the first Circus engagement in a particular city. In 1996 alone, there were 6.5 billion reproductions or impressions of the mark THE GREATEST SHOW ON EARTH in markets where the Circus performed.

15. Through its joint promotion program, Ringling provides Circus tickets to certain retailers for distribution to customers. In return, these retailers pay for print advertising and television and radio advertising of their services in association with Ringling's trademarks including, among others, THE GREATEST SHOW ON EARTH. Virtually all joint promotions include the prominent display of the mark THE GREATEST SHOW ON EARTH, resulting in significant additional exposure of the mark to the public. Ringling has engaged in joint campaigns with companies that provide a wide variety of services. By way of example, there have been joint promotions with restaurants, supermarkets, drug chains, department stores, electronics stores, and clothing stores.

16. The mark THE GREATEST SHOW ON EARTH is currently under a joint sponsorship arrangement with Sears, and under license agreements with the MBNA credit card, Cheeseborough–Ponds, and other parties who produce such diverse goods as calendars, food products, candy, bronze miniatures and Franklin Mint clocks.

17. Because of the Circus' renown, Ringling's mark, THE GREATEST SHOW ON EARTH, receives substantial free publicity, much of which is unsolicited. Such publicity includes newspaper and magazine articles. Moreover, the Circus has been the subject of books, radio and television features, and motion picture productions.

18. Through the advertising and promotion efforts of Ringling, the mark THE GREATEST SHOW ON EARTH is identified in the public mind with the Ringling Circus, and creates good will and publicity value for the mark THE GREATEST SHOW ON EARTH.

19. As a direct result of the promotion and protection of its mark, Ringling, over a period of several decades, has caused the mark THE GREATEST SHOW ON EARTH to be identified in the public mind solely with Ringling and its Circus, thereby creating publicity value for the mark.

20. Utah Division of Travel Development is an agency of the State of Utah, located and doing business in Salt Lake City.

21. At some time prior to the effective date of the Dilution Act, at a time when THE GREATEST SHOW ON EARTH was a famous trademark, Utah began using THE

GREATEST SNOW ON EARTH in connection with Utah tourism services.

22. Utah used THE GREATEST SNOW ON EARTH as early as 1962 to advertise its winter skiing facilities.

23. Prior to the time that Utah adopted the mark THE GREATEST SNOW ON EARTH, Ringling advertised and promoted its mark in Utah in connection with the Circus.

24. The Utah Attorney General issued a legal opinion in 1965 concluding that the mark "Utah for the Greatest Snow on Earth" does not impair or violate Ringling's mark THE GREATEST SHOW ON EARTH.

25. Utah registered its mark with the State of Utah in 1975, renewed its registration in 1985 and 1995, and its registration is current.

26. Utah submitted an application to the U.S. Patent and Trademark Office to register its mark THE GREATEST SNOW ON EARTH in 1988. Ringling filed a formal opposition to Utah's right to register its mark. A three-member panel of the U.S. Trademark Trial and Appeal Board rendered a unanimous 16–page decision on December 13, 1995, granting Utah the right to register its mark and dismissing Ringling's opposition. This decision specifically states that dilution is not a valid basis for opposing a trademark application. Ringling filed a notice of appeal of the decision of the Trademark Trial and Appeal Board, but later voluntarily dismissed its appeal. Utah was granted federal registration for its mark THE GREATEST SNOW ON EARTH on January 21, 1997.

27. THE GREATEST SHOW ON EARTH was promoted by Ringling in Utah in connection with its performances and related merchandise on 37 different dates over the years 1905–1958, and since that time, the Circus has performed in Utah on 156 different dates.

28. Utah has used THE GREATEST SNOW ON EARTH in advertisements in the magazines SKI, SKIING, or both, every year from 1962 to the present, except 1963, 1977, and 1989.

29. Utah has consistently used, and continues to use, the mark THE GREATEST SNOW ON EARTH to promote winter tourism in the state of Utah.

30. Utah has authorized the Utah Ski Association ("Ski Utah"), an association of private and governmental entities, to use the mark THE GREATEST SNOW ON EARTH in connection with Ski Utah's promotion of Utah tourism. All of Ski Utah's stationery and business cards bear the mark THE GREATEST SNOW ON EARTH, and have done so since 1991.

31. Utah's entire budget for the 1995–96 winter tourism advertising campaign was $450,000, and Ski Utah's 1995–96 marketing budget was $683,401. For each of the past fifteen years, Utah's budget for winter advertising that includes THE GREATEST SNOW ON EARTH, has ranged from $300,-000 to $450,000.

32. Utah received no revenues beyond its legislative appropriation, which covers only Utah's expenses.

33. Ski Utah mailed a media release for Fall/Winter 1995–96 entitled "UTAH STARS AS THE MAIN ACT IN THE GREATEST SNOW ON EARTH." Ski Utah used phrases such as "Utah is the main, show stealing act:", and "Get your tickets to The Greatest Snow on Earth."

34. During the 1996–97 marketing campaign, Utah created a homepage on the Internet. This homepage is linked with another Internet site maintained by Ski Utah which uses the mark THE GREATEST SNOW ON EARTH.

35. Utah has never used its mark THE GREATEST SNOW ON EARTH in connection with, or in the context of, a circus.

36. Ringling has never used its mark in connection with winter sports in Utah.

37. Utah occasionally uses ad copy that does not include THE GREATEST SNOW ON EARTH to promote its winter, ski-related tourism. For example, in the past year, Utah has used "Utah. Winter Wonder Full,"; "Utah. Let The Games Begin"; and "Utah. America's Winter Choice".

38. In an effort to demonstrate dilution of its mark, Ringling retained a marketing firm, RL Associates, to design and conduct a survey of consumers. The goal was to measure recognition and dilution of Ringling's famous mark, THE GREATEST SHOW ON EARTH. The survey was conducted by interviewing individuals at seven malls in geographically diverse locations throughout the country. One of the malls was located in the state of Utah. At each mall location, randomly selected shoppers were presented with a series of three file cards containing typed statements. Each statement was a "fill-in-the-blank", with a key term missing. The first two statements were controls, namely, "I LOVE" _____ and "DON'T LEAVE _____ WITHOUT IT". The third statement was the relevant statement, "THE GREATEST _____ ON EARTH". On being shown each card, the shopper was asked what word or words they would use to complete the statement. If the shopper answered "none", the interviewer moved on to the next card. If the shopper completed the statement, he or she was then asked with whom or what they associated the completed statement. Shoppers completing the statement were asked further whether they could think of any other way to complete the statement, and with whom or what they associated that completed statement.

39. Ringling's expert evaluated the survey results in an attempt to answer two questions: (i) is THE GREATEST SHOW ON EARTH a well known and famous mark associated uniquely with Ringling, and (ii) does Utah's mark lessen the "uniqueness" of Ringling's mark, and its association with the Circus, in Utah.[2] To address the first question, Ringling's expert presented results of the survey by comparing public awareness of THE GREATEST SHOW ON EARTH and the association of the mark with Ringling, with public awareness of the mark DON'T LEAVE HOME WITHOUT IT and American Express. Ringling contends that this comparison is informative because DON'T LEAVE HOME WITHOUT IT has been held by courts to be a famous slogan.[3] To address the second question, Ringling's expert presented results of the survey by comparing the responses to the statement THE GREATEST _____ ON EARTH in Utah with responses from elsewhere in the country.

40. With respect to the fame of the mark and its unique association with Ringling, the survey results reflect (i) that 52% of respondents in Utah and 44% of respondents outside of Utah completed the statement DON'T LEAVE WITHOUT IT with the word HOME, and associated the completed statement with American Express; and (ii) that 46% of respondents in Utah and 41% of respondents outside of Utah completed the statement THE GREATEST _____ ON EARTH with the word SHOW, and associated the completed statement with the Circus.

41. With respect to the question of dilution of Ringling's mark in Utah, the survey results show that within Utah (i) 25% of respondents completed the statement THE GREATEST _____ ON EARTH with only the word SHOW and associated the completed statement with the Circus; (ii) 24% completed that statement with only the word SNOW and associated the completed statement with Utah; and (iii) 21% of respondents completed that statement with SHOW and associated the result with the Circus and also completed this statement with SNOW and associated the completed statement with Utah. So in Utah, a total of 46% of respondents completed the statement THE GREATEST _____ ON EARTH with the word SHOW and associated the completed statement with the Circus, and a total of 45% of respondents completed that statement with the word SNOW and associated the completed statement with Utah. The survey further reflects that outside of Utah (i) 41%

---

**2.** *See* RL Associates, Recognition Levels and Potential for Dilution of THE GREATEST SHOW ON EARTH 2 (April 1996)(expert report prepared for plaintiff) ("Rappeport Report").

**3.** *See* Rappeport Report, at 10. The Rappeport Report does not cite support for its contention

that DON'T LEAVE HOME WITHOUT IT has been held by courts to be a famous mark. Nevertheless, that contention is the report's justification for using DON'T LEAVE HOME WITHOUT IT as a relative measure of the fame of Ringling's mark, THE GREATEST SHOW ON EARTH.

of respondents completed the statement THE GREATEST _____ ON EARTH with only the word SHOW and associated the completed statement with the Circus; (ii) 0% completed that statement with only the word SNOW and associated the completed statement with Utah; and (iii) fewer than 0.5% of respondents completed that statement with SHOW and associated the result with the Circus and also completed this statement with SNOW and associated the completed statement with Utah.

## II. CONCLUSIONS OF LAW

■ Ringling claims that Utah's mark violates the Lanham Act ("the Act"), which was amended on January 16, 1996 to include a federal cause of action for dilution, 15 U.S.C. § 1125(c). In a federal dilution action, a plaintiff bears the burden of proving (i) that it owns a famous mark, (ii) that the defendant adopted its mark after the plaintiff's mark became famous, and (iii) that defendant's mark dilutes the famous mark. *See Clinique Laboratories, Inc. v. Dep. Corp.*, 945 F.Supp. 547, 561 (S.D.N.Y.1996).

The facts reflect,[4] and Utah does not contest, that Ringling has demonstrated the first two elements of a dilution claim, namely that Ringling's mark, THE GREATEST SHOW ON EARTH, is a famous mark and that Utah's mark was adopted after THE GREATEST SHOW ON EARTH became famous. Thus, the heart of this dispute is the third element, whether Utah's mark dilutes or has diluted Ringling's mark. And

resolution of this dispute requires elucidating the concept of dilution under the Act and determining how this phenomenon can be detected or measured.

■ When Congress amended the Act in 1996 to allow a dilution claim, it was not venturing into uncharted territory. Several states already allowed such claims. Interestingly, courts applying state dilution statutes have variously observed that dilution is "a somewhat nebulous concept"[5] and that its application involves navigating in the "murky waters" of anti-dilution analysis.[6] Against this background, Congress, in 1996, chose to define dilution as

> the lessening of the capacity of a famous mark to identify and distinguish goods and services, regardless of the presence or absence of—(1) competition between the owner of the famous mark and other parties, or (2) likelihood of confusion, mistake, or deception.

15 U.S.C. § 1127. While making clear what dilution is, namely, the erosion of a famous mark's power to identify and distinguish goods and services,[7] the Act does not specify how dilution occurs or how it may be detected or measured. Courts applying state dilution statutes recognize that dilution occurs in either of two ways: (i) when a junior mark causes "tarnishment" of the famous mark and (ii) when the use of the junior mark causes "blurring" of the famous mark's power to identify and distinguish goods and ser-

---

**4.** Over 40% of respondents in the United States, both inside and outside of Utah, were able to (i) to complete the incomplete phrase THE GREATEST _____ ON EARTH with the word SHOW to form Ringling's mark, THE GREATEST SHOW ON EARTH, and (ii) to associate that mark with the Circus. This percentage is substantially the same as those respondents who were able to correctly associate DON'T LEAVE HOME WITHOUT IT and American Express.

**5.** *See Sally Gee. Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2nd Cir.1983) (construing New York anti-dilution statute).

**6.** *See Mead Data Cent., Inc. v. Toyota Motor Sales*, 875 F.2d 1026, 1034 (2nd Cir.1989) (Sweet, J. concurring)("construing New York anti-dilution statute").

**7.** In creating the dilution action, Congress specified that this erosion is actionable notwithstand-

ing the existence of competition or likelihood of confusion, in contrast to the Act's long-standing cause of action for direct infringement, wherein a famous mark owner is required to demonstrate that the use of an imitative mark "is likely to cause confusion, or to cause mistake, or to deceive." *See* 15 U.S.C. § 1114. Infringement, then, essentially requires that the protected and imitative marks be used in connection with competing goods and services or that there exists some potential for source confusion. A federal dilution claim, by contrast, shifts the focus away from consumer protection and towards the protection of an owner's quasi-property right in a famous mark, itself. *See, e.g.,* Malla Pollack, *Time to Dilute the Dilution Statute and What Not To Do When Opposing Legislation*, 78 J. Pat. & Trademark Off. Soc'y 519, 520 (1996).

vices. *See, e.g., Mead Data Central, Inc. v. Toyota Motor Sales, U.S.A., Inc.,* 875 F.2d 1026, 1031 (2nd Cir.1989)(applying New York anti-dilution statute). Although the Act does not specifically mention either of these effects, both are appropriate elucidations of the dilution concept given that both were contemplated by the Act's drafters and are consistent with the Act's purpose. *See Clinique,* 945 F.Supp. at 561 (citing H.R.Rep. No. 374, 104th Cong., 1st Sess. 3 (1995) ("[The amendments] protect famous trademarks from subsequent uses that blur the distinctiveness of the mark or tarnish or disparage it. ....")).

Dilution through tarnishing can occur where an accused, junior mark is used on unwholesome or inferior goods or services that may create a negative association with the goods or services covered by the famous mark. *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2nd Cir.1994)(construing New York anti-dilution statute).[8] No tarnishing exists here. Ringling has not produced any evidence of tarnishment of its mark, nor does it contend that Utah's mark creates the risk of negative associations with the Ringling Circus. Accordingly, Ringling cannot recover under the tarnishment theory of dilution.

Blurring is the diluting effect Ringling complains of here. Specifically, Ringling contends that the power of its famous mark has been diluted through blurring caused by the use of Utah's similar, but junior mark. Not every use of a similar mark will blur a famous mark. As Utah's counsel pointed out at trial, the human mind has the capacity to recognize the distinctiveness of a multiplicity of concepts, ideas and images without confusion or association. And this is true even where the concepts are closely related, or where the words signifying different concepts are similar in form or sound. The question presented is what uses of a similar, junior mark dilute a senior mark. And in this inquiry, it is necessary to describe blurring with greater specificity.

Blurring has been variously described by courts as the use or modification of a famous mark "to identify the defendant's goods and services",[9] as "a 'whittling away' of the selling power of the mark",[10] and as a use that causes the famous mark to "no longer ... call immediately to mind" the plaintiff's goods or services.[11] These formulations are not helpful in bringing blurring into sharper focus. To define blurring as "a whittling away" begs the question of what uses of a mark blur or whittle away a famous mark and how this effect can be detected or measured. Similarly, simply saying that blurring occurs when the famous mark becomes identified with the goods or services of a junior mark user is to do no more than repeat the words of the Act defining dilution as the lessening of a famous mark's ability to identify goods or services.

Similarly, an examination of the definition of "blurring" does little to advance the analysis. Webster's Third New International Dictionary defines the verb "to blur", in part, as "to make dim, indistinct, or vague in outline or character" and, alternatively, as "to make dim, imperfect or confused (as the senses or mental faculties)". And the term "blurred" is defined, in part, as "characterized by dimness, indistinctness, or obscurity ...: VAGUE, CONFUSED". These definitions parallel the statutory definition of dilution,

8. For example, an adult entertainment provider was found to dilute Hasbro's "Candy Land" mark when it used the name Candyland to identify its sexually explicit Internet site. *Hasbro. Inc. v. Internet Entertainment Group, Ltd.,* 1996 WL 84853, at *1 (W.D.Wash.1996).

9. *See, e.g, Clinique,* 945 F.Supp. at 562(construing the Act but citing *Deere & Co. v. MTD Products, Inc.,* 41 F.3d 39, 43 (2nd Cir.1994), a case construing New York anti-dilution provision) ("Dilution by blurring occurs where 'the defendant uses or modifies *the plaintiff's trademark* to identify *the defendant's goods and services,* raising the possibility that the mark will lose its ability to serve as a unique identifier of the plaintiff's prod-

uct.' ... [B]lurring is concerned with an injury to the mark's selling power .... ").

10. *Panavision Intern., L.P. v. Toeppen,* 945 F.Supp. 1296, 1304 (C.D.Cal.1996) (construing the Act) (" 'Blurring' involves a 'whittling away' of the selling power and value of a trademark by unauthorized use of the mark.")

11. *Exxon Corp. v. Exxene Corp.,* 696 F.2d 544, 550 (7th Cir.1982) (construing the Illinois state anti-dilution statute) ("No longer would the [famous mark] call immediately to mind the [covered product]. The mental image would be blurred....")

which focuses on a famous mark's power to identify distinctly goods or services. Interestingly, these definitions also refer to "confusion", a factor that Congress specifically made irrelevant to a dilution claim. Yet, confusion is indeed inherent in blurring dilution and, hence, it is worth distinguishing between the confusion inherent in dilution by blurring and the confusion excluded from the dilution inquiry by § 1127 of the Act.

 In a classic infringement action, a plaintiff must demonstrate that a defendant's use of a junior mark "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114. This provision seeks to protect consumers from junior marks that intentionally or incidentally mislead.[12] And in that context, "confusion" refers to a "source confusion", *i.e.*, that consumers seeing the junior mark will believe that the goods or services bearing that mark come from or are in some way affiliated with the owner of the senior mark. "Source confusion" is irrelevant to the dilution inquiry. Dilution is concerned not with protecting consumers, but with protecting a property interest held by the owner of a famous mark. *See supra*, note 7. Yet, as the definition of blurring reflects, dilution by blurring involves a type of confusion, albeit different from "source confusion". Blurring results from an incorrect association of the marks in consumer's minds. *See, e.g., Mead Data*, 875 F.2d at 1031 ("[T]here must be some mental association between plaintiff's and defendant's marks.").[13] And this association is mistaken or confused to the degree that the marks and the goods or services they identify are not and should not be associated. To the contrary, these marks and their owners are distinct, and should be seen and understood to be distinct by persons coming into contact with either mark. To the extent that persons seeing the marks mistakenly associate them, the famous mark's power to identify and distinguish goods or services is diluted. Thus, while "source confusion" is irrelevant to the dilution inquiry, dilution by blurring entails confusion in that the famous and junior marks become wrongly or mistakenly associated in the minds of consumers.

 The Act's causation requirement confirms the validity of the insight that dilution by blurring occurs when consumers mistakenly associate (or confuse) the two marks. It is not open to serious dispute that the Act requires a causal nexus between the use of the junior mark and the dilution of the famous mark.[14] It is precisely this causal nexus that is reflected in the mistaken or confused association of the marks in the minds of consumers and which, of course, results in the proscribed dilution of the famous mark. Put another way, famous marks can lose their distinctiveness or power to identify and distinguish goods and services for various reasons other than the use of a junior mark.[15] Absent a demonstration or reasonable inference of the causal nexus between the actionable dilution and a junior mark, a court cannot attribute the dilution to the junior mark's use.[16] This nexus is demonstrated where

---

12. *See, e.g., Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492 (2nd Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961)(developing test to determine whether consumers are likely to be confused by junior mark).

13. The *Mead Data* panel cited 2 J. McCarthy, *Trademarks and Unfair Competition* § 24.13 at 213–14 (2d Ed.1984):

[I]f a reasonable buyer is not at all likely to link the two uses of the trademark in his or her own mind, even subtly or subliminally, then there can be no dilution. . . . [D]ilution theory presumes *some kind of mental association* in the reasonable buyer's mind between the two party's [sic] uses of the mark.

14. *See* 15 U.S.C. § 1125(c)(1) (injunction available if junior mark "causes dilution of the distinctive quality of the [famous] mark").

15. For example, a famous mark may lose its ability to identify goods or services because it becomes a part of the common lexicon as a generic reference to a type of product.

16. This required nexus presents an interesting question on the facts of this case. Utah contends, and the record reflects, that its commercial use of the mark targets consumers outside of Utah. And outside of Utah, virtually no one is aware of Utah's mark. on the other hand, in Utah, significant numbers of people are aware of Utah's mark. But Utah's primary use of the mark in Utah is its display on the state's license plates, an allegedly noncommercial use. Significantly, a non-commercial use of a mark is not actionable under the anti-dilution provision of the Act. 15 U.S.C. § 1125(c)(4)(B). Thus, Utah argues, even if Ringling's mark is diluted in Utah, it is diluted by a non-commercial, and

consumers mistakenly link or associate the two marks.

■■■■■ Dilution by blurring, then, occurs where consumers mistakenly associate the famous mark with goods and services of the junior mark. In this way, the power of the senior mark to identify and distinguish goods and services is diluted. It follows that even if the famous and junior marks are quite similar, no blurring occurs where consumers do not mistakenly associate or confuse the marks and the goods or services they seek to identify and distinguish. An apt example of this occurred in *Mead Data*, 875 F.2d 1026.[17] There, the provider of a legal research service that used the name LEXIS sought an injunction against Toyota Motor Corporation's use of the mark LEXUS for a line of luxury automobiles. To recover for dilution, Mead Data was not required to show that consumers would mistakenly believe that the luxury automobiles bearing the LEXUS mark were built or supplied by the legal database provider. In other words, Mead Data did not have to show that the similar marks caused confusion as to the source of the products covered by the marks. But to show dilution, Mead Data was required to prove that its mark had lost some of its capacity to identify and distinguish its legal research services because of Toyota's use of LEXUS. This would occur only where a consumer seeing LEXIS does not think exclusively of legal research, but also mistakenly associates that mark with automobiles.[18] This is the harm protected by the dilution statute. If no person ever associates the two uses of the marks, then there is no lessening of the capacity of LEXIS to identify legal research services caused by the use of LEX-

US and, thus, no actionable dilution, notwithstanding the substantial similarity of the marks.

■■■■ Given this elucidation of dilution by blurring, the next question in the inquiry is to consider how blurring can be shown or detected. Because the effect of blurring may manifest itself directly in harm to the selling power of the famous mark, dilution by blurring may be shown by proof that the use of a junior mark has caused a lessening of demand for the product or services bearing the famous mark or for use of the famous mark in co-promotions. Ringling concedes that neither has occurred here.[19] Unable to show any loss of its mark's selling power, Ringling seeks to show dilution by the direct evidence of a survey of consumers and indirectly or circumstantially by the application of a multifactor balancing test. Each is separately addressed.

### A. Survey Evidence

■■■■ Ringling contends that survey evidence demonstrates directly that, within Utah, Utah's mark dilutes Ringling's famous mark. Specifically, Ringling contends that, within Utah, only 25% of respondents, compared to 41% nationwide, associate the incomplete statement THE GREATEST _____ ON EARTH with Ringling alone. Thus, by Ringling's lights, Utah's use of its junior mark has caused respondents in Utah to associate the uses of Ringling's and Utah's marks, thereby diluting THE GREATEST SHOW ON EARTH.

■■■■ Utah attacks the survey on the basis of the survey's population universe, contend-

---

thereby unactionable, use. The causal link between Utah's commercial use of its mark and the dilution of Ringling's famous mark is not relevant to the disposition of this case.

17. In *Mead Data*, the Second Circuit reversed the district court's holding that the use of LEXUS was likely to dilute the distinctive quality of the 'mark LEXIS, concluding (i) that LEXIS did not have a distinctive quality in the general public that LEXUS could dilute, and (ii) that persons for whom LEXIS would have a distinctive quality and meaning were sophisticated consumers and unlikely to associate the two uses of the marks. 875 F.2d at 1031–32.

18. Thus, an association connotes more than knowledge of both the LEXIS and LEXUS marks. It is possible for a person to hold words and concepts separate in her mind even where the words or concepts are similar in form or sound. An association is created where the similarities are so great that a link between the two marks is formed that makes the famous mark call to mind the junior mark, or the goods and services covered by the junior mark.

19. At oral argument Ringling conceded that the value of its mark for licensing had not diminished and that it had no evidence of any damages.

ing that the survey improperly focuses on shoppers generally in malls and not on wealthy travelers and skiers, the groups targeted by Utah's winter sports promotions. This attack fails. It is Ringling's famous mark that should be the focus of the dilution survey, for it is injury to that mark that is in issue. It follows that the survey's focus on shoppers generally—in essence a cross-section of the general population[20]—is appropriate because it is this universe of persons that comprises the market for Ringling's goods and services.

Yet, no evidence in the survey demonstrates that Utah's use of THE GREATEST SNOW ON EARTH lessens the capacity of THE GREATEST SHOW ON EARTH to distinguish Ringling's circus and associated merchandise. Instead, the evidence shows that Utah's junior mark THE GREATEST SNOW ON EARTH is virtually unknown outside of Utah, but well known within Utah. Thus, outside of Utah, the survey provides no evidence of dilution of THE GREATEST SHOW ON EARTH. Indeed, the survey seems to show conclusively that in the whole of the country outside of Utah, Utah's mark has caused no dilution of Ringling's famous mark.

Within Utah, the survey provides no evidence that persons associate the mark THE GREATEST SHOW ON EARTH with Utah, snow or skiing. Survey respondents did not fill in the blank with SHOW and associate the result with Utah skiing. Nor did fewer respondents in Utah associate the famous mark with a circus. To the contrary, 46% of respondents in Utah, compared to 41% elsewhere, associated THE GREATEST SHOW ON EARTH with Ringling. Thus, the power of Ringling's famous mark to identify and distinguish the Circus is as strong within Utah, where the junior mark is ubiquitous, as it is outside of Utah, where the junior mark is essentially unknown. This is strong evi-

dence of the absence of dilution, not the presence of it.

Within Utah, 21% of respondents filled in SHOW and SNOW and correctly associated the marks with the Circus and Utah, respectively. Survey data reflects no mistaken or confused association of the marks or the goods or services they identify. Further, 24% of respondents only filled in SNOW, and related the phrase to Utah. Yet, this does not demonstrate that Utah has lessened the capacity of THE GREATEST SHOW ON EARTH to identify and distinguish the circus. Rather it reflects that respondents had no difficulty keeping the two marks separate in their minds in terms of the goods and services each mark identifies and distinguishes.

Ringling contends that dilution is shown because its survey demonstrates that its mark shares "top of the mind" status in Utah with Utah's mark. In other words, Ringling contends that its mark no longer "call[s] immediately to mind" the circus in Utah. *See Exxon Corp.*, 696 F.2d at 550. Even assuming, *arguendo*, that "top of mind" status is a valid measure of dilution,[21] the survey is unpersuasive on this point. The survey does not demonstrate that Utah shares "top of the mind" in Utah with Ringling for the mark THE GREATEST SHOW ON EARTH. When confronted with the famous mark, respondents in Utah associated that mark with Ringling at a rate higher than the rest of the country, and did not associate the mark with Utah or skiing. The survey demonstrates that Ringling does share "top of the mind" in Utah with respect to THE GREATEST _____ ON EARTH. In other words, when faced with the phrase THE GREATEST _____ ON EARTH, 45% of respondents in Utah associate that incomplete statement with Utah, and 46% of respondents in Utah associate that incomplete statement with

**20.** This assumes, probably correctly, that in this country's current culture the general population shops at malls and those who escape this experience are few and eccentric.

**21.** Ringling's expert referred variously to "top of mind", "initial response", and "call to mind" to

describe the immediate recall of goods or services upon seeing a mark. He testified further that this "top of mind" position reflected the goal of a marketer, and was an accurate measure of a mark's capacity to identify and distinguish goods and services.

Ringling.[22] But Ringling's famous mark is the completed phrase THE GREATEST SHOW ON EARTH, not the incomplete phrase THE GREATEST _____ ON EARTH.[23] And the survey provides no direct evidence that this famous mark is diluted.

Ringling's survey evidence does not demonstrate that Utah's mark lessens the capacity of THE GREATEST SHOW ON EARTH to identify and distinguish the Circus in Utah.[24] In fact, slightly more people associate the famous mark with Ringling in Utah than in areas where Utah's mark is unknown. Moreover, the survey demonstrates that persons confronted with the famous mark associate it only with the Circus and do not associate that mark with Utah, with winter sports, or with any activities that are attributable to Utah's use of THE GREATEST SNOW ON EARTH.[25]

### B. *Circumstantial Evidence of Dilution*

 Recognizing that direct evidence of blurring may often be difficult to adduce, courts have also assessed the likelihood of dilution through a multi-factor balancing test originally articulated for use in the New York dilution statute. This test balances factors including (i) the similarity of the marks, (ii) the similarity of the products or services covered by the marks, (iii) the sophistication of consumers, (iv) predatory intent, (v) renown of the senior mark, and (vi) renown of the junior mark. *See Mead Data Cent.*, 875 F.2d at 1035 (Sweet, J. concurring); *see also Clinique*, 945 F.Supp. at 562 (applying these factors to federal dilution claim); *WAWA, Inc. v. Haaf*, 1996 WL 460083, *3 (E.D.Pa.1996)(same); *Ringling Bros.-Barnum & Bailey v. B.E. Windows*, 937 F.Supp. 204, 211 (S.D.N.Y.1996)(same). Balancing these factors may demonstrate circumstantially the likelihood of dilution through blurring.

### 1. Similarity of the Marks.

 For blurring to occur, a junior mark must be substantially similar to a senior mark. *See B.E. Windows*, 937 F.Supp. at 211 (*citing Mead Data*, 875 F.2d at 1029). The greater the similarities, the more likely it is that the uses of the two marks will be mistakenly associated and, hence, the more likely it is that the junior mark has caused actionable dilution. There is, indisputably, a substantial degree of superficial similarity in the marks here at issue. Thus, they differ in only one word, have a similar cadence, and the substituted word, SNOW, in the junior

---

**22.** These figures include the 21% of respondents in Utah who associate the incomplete phrase with both Utah and the Circus, but who do not mistakenly associate or confuse the marks or the goods and services each identifies and distinguishes.

**23.** Ringling's counsel suggested at trial that Ringling believes it owns the incomplete phrase THE GREATEST _____ ON EARTH. Thus, Ringling has pursued dilution actions against such varied marks as "The Greatest Bar on Earth", *B.E. Windows*, 937 F.Supp. at 206, and "The Greatest Used Car Show on Earth", *Ringling Bros.-Barnum Bailey v. Celozzi-Ettelson*, 855 F.2d 480, 481 (7th Cir.1988). This is not persuasive. Of course, some marks in the form of THE GREATEST _____ ON EARTH may dilute Ringling's famous mark. But this fact does not entitle Ringling to protect this incomplete phrase itself. Instead, Ringling must demonstrate that Utah's mark or any mark using this form dilutes the famous mark THE GREATEST SHOW ON EARTH. For example, had respondents completed the statement with SHOW, but associated the resulting statement, THE GREATEST SHOW ON EARTH, with Utah, snow, or skiing, blurring

would be shown. In that event, the famous mark would be mistakenly associated, at least in part, with Utah's goods and services, thereby lessening the distinctiveness of Ringling's famous mark. Similarly, if respondents were shown a card containing the mark, THE GREATEST SHOW ON EARTH, and mistakenly associated that mark with Utah's winter sports, dilution by would be shown.

**24.** Because the survey evidence does not demonstrate dilution, it is not necessary to address Utah's contention that the survey evidence is unreliable because respondents were not shown the famous mark in a manner in which the mark normally appears, *i.e.*, with circus style lettering on promotional materials.

**25.** The record reflects a few respondents completed the statement with "show", to get the famous mark, but associated the mark in an irrelevant manner. For example, respondents associated THE GREATEST SHOW ON EARTH with "theater" and "movie". These mistaken associations are too few to reflect dilution and, in any event, are not attributable to Utah's use of the mark.

mark, rhymes with the word SHOW in the famous mark. Yet, SNOW and SHOW are not invented words. They are a familiar part of the lexicon that persons routinely use and distinguish with presumably little difficulty.[26] In *B.E. Windows*, the court found that "The Greatest Bar of Earth" was not substantially similar to THE GREATEST SHOW ON EARTH because of (i) the inherent difference between "bar" and "show", and (ii) the common use of the remainder of the mark as a laudatory phrase. 937 F.Supp. at 212. Similarly, while the rhyme between SHOW and SNOW suggests some similarity, the effect of this substitution in creating what are basically descriptive phrases describing markedly different products reduces the importance of the similarity.[27] Thus, the superficial similarity in the marks is undermined by the ease with which people can distinguish SNOW and SHOW, and this factor does not militate in favor of dilution.

## 2. Similarity of the Products Covered by the Marks.

 The similarity of the goods or services covered by the marks is important, despite the fact that competition is not a factor in a federal dilution claim, because "where the products sold under the marks in dispute are alike, there is a greater likelihood that blurring will occur in the mind of the consumer." *B.E. Windows Corp.*, 937 F.Supp. at 212. In the most general terms, both Ringling and Utah use their marks in connection with recreational activities. Beyond this similarity, however, the products are not at all alike. Ringling's product is a circus that travels the country providing an afternoon or evening of spectator entertain-

ment. Utah's product is active winter sport opportunities that participants travel to Utah to engage in usually for several days. The products covered by the two marks in dispute are entirely dissimilar, which points persuasively to the absence of dilution.

## 3. Sophistication of Consumers.

 Blurring is less likely where the consumers of the goods or services covered by the famous mark are sophisticated. *Mead Data Cent.*, 875 F.2d at 1031–32. In other words, where consumers make educated and deliberate decisions to purchase a good or service, they are less likely to be confused by the existence of a similar mark covering a dissimilar product. *Id.* Ringling's customers doubtless include both sophisticated and unsophisticated persons, but the decision to attend the Circus does not typically entail education or research. Ringling clearly markets and promotes its product broadly to attract all types of people to the Circus. By contrast, Utah's marketing approach targets a much smaller group of consumers, namely affluent skiers interested in extended ski vacations. And these consumers are likely to make researched and educated decisions concerning their winter tourism destinations. In other words, these consumers are sophisticated with respect to Utah's skiing opportunities. Yet, the examination of the "sophistication" factor should generally focus on the famous mark owner's customers, because it is among these consumers that dilution will occur. *See, e.g., B.E. Windows Corp.*, 937 F.Supp. at 212. But where, as here, a junior mark is only targeted at a small subset of a claimant's customers, it is also appropriate to consider the sophistica-

**26.** As discussed above, it is possible to be aware of numerous words similar in form or sound without associating these words or losing sight of the distinctiveness of each individual word. *See supra*, note 18. Thus, in the course of everyday life, people use SNOW and SHOW without associating these words or lessening the capacity of these words to identify and distinguish different things.

**27.** The similarity of the products covered by the marks is a separate factor under *Mead Data*. But where, as here, the marks themselves consist of a description of the products, the similarity of the products described by the mark is also relevant

to the first *Mead Data* factor. Often a mark will not have any meaning independent from the product or any descriptive force. Thus, the products covered by LEXIS and LEXUS are not relevant to an evaluation of those marks' similarity. Yet, where, as here, marks have descriptive effect, the description is relevant to an evaluation of the similarity of the marks. For example, the hypothetical mark THE GREATEST CARNIVAL ON EARTH is more similar to THE GREATEST SHOW ON EARTH than a mark describing a wholly unrelated product, such as THE GREATEST HAMMER ON EARTH or THE GREATEST SNOW ON EARTH.

tion of this subset of consumers. This is so because only this subset is likely to come into contact with the junior mark, and such contact is essential to demonstrating to any dilution by blurring is caused by that junior mark. Utah's commercial use of the junior mark is confined to a relatively sophisticated group of consumers. These consumers are unlikely to blur the famous mark, THE GREATEST SHOW ON EARTH, with Utah's mark and the winter recreational activities it identifies. In the final analysis, the lack of sophistication of Ringling's customers is mitigated by the sophistication of Utah's customers and, thus, this third factor does not point persuasively one way or the other.

### 4. Predatory Intent.[28]

 The likelihood of blurring is increased where a junior mark is used in hopes of benefiting from its similarity to a famous mark. This is clear because, in that event, a junior mark is adopted specifically to capitalize on a famous mark and to pirate some of its capacity to identify. To demonstrate predatory intent, Ringling relies on (i) Utah's presumed knowledge of Ringling's famous mark before its adoption of THE GREATEST SNOW ON EARTH, and (ii) Utah's alleged efforts to expand its mark notwithstanding its longstanding knowledge of Ringling's trademark. This evidence fails to persuasively demonstrate predatory intent. Utah's adoption and use of its mark notwithstanding its knowledge of Ringling's famous mark cannot, without more, demonstrate predatory intent. Such actions are as consistent with a belief that Utah's mark does not

dilute as they are with an intent to benefit from the similarity in the marks. In other words, while knowledge of a famous mark is necessary to demonstrate that a subsequent mark was adopted deliberately to benefit from similarity between the marks, that knowledge, by itself, is not sufficient to demonstrate that a defendant adopted the mark with predatory intent. Utah clearly believes that its mark is not similar to or associated with the famous mark, and Utah has not exploited any similarity of its mark with that of Ringling through the presentation of THE GREATEST SNOW ON EARTH with circus style lettering or circus themes. Moreover, the record reflects that Utah had a good faith, reasonable belief that its use of THE GREATEST SNOW ON EARTH was entirely lawful.[29]

Ringling also points to a Utah Fall/Winter 1995–96 press release as evidence of predatory intent. By Ringling's lights, this press release reflects Utah's intent to benefit from the similarity of the marks because it allegedly evokes Circus imagery, stating, in part, "Utah Stars As Main Act in the Greatest Snow of Earth" and "Get your tickets to the Greatest Snow on Earth now!" Ringling's reliance on this press release is of no avail. Any inference of predatory intent created by the press release is conclusively rebutted by Utah's uncontradicted explanation of the press release as a reference to the theater, not a circus. The press release reports comments made by a Washington, D.C. meteorologist who described "the drama of American skiing." Pursuing this analogy, the meteorologist described the Cascades and Sierra

---

28. Some courts construing the Act have concluded that predatory intent is not a factor in the analysis of a dilution claim under the Act. *See, e.g., Clinique,* 945 F.Supp. at 562. This conclusion is apparently based on the Act's enhanced remedies for dilution where it is shown that a defendant "willfully intended to trade on the owner's reputation or to cause dilution of the famous mark." 15 U.S.C. § 1125(c)(2). Thus, the Act is read to authorize the consideration of "willful intent", a concept similar to predatory intent, with respect to available remedies but not with respect to dilution. This conclusion is not persuasive and not adopted here. An accused diluter's intent can be relevant to the determination of both (i) a circumstantial case of dilution, and (ii) available remedies for such dilution. Thus, the inclusion of "willful intent" elsewhere

in the statute is no basis, in and of itself, for ignoring predatory intent as a factor in the analysis of circumstantial evidence of dilution. Moreover, predatory intent—the deliberate adoption of a junior mark to benefit from the fame of a senior mark—increases the likelihood that a junior mark will be used in a manner that will lessen the capacity of a famous mark to identify goods and services.

29. This conclusion is supported by (i) Utah's registration of its mark in Utah, (ii) the opinion Utah received from the Utah Attorney General that the use of its mark was appropriate, and (iii) the defeat of Ringling's opposition to Utah's right to federal registration of the mark in 1995.

Nevadas as a "prologue", Colorado and New Mexico as the "epilogue", and Utah as "the main, show-stealing act". It is in this context, not in the context of a circus, that the release refers to Utah as a "star" and to buying "tickets". Thus, Ringling's reliance on this press release to show Utah's predatory intent is conclusively rebutted, and predatory intent does not militate in favor of dilution.

## 5. Renown of the Senior Mark.

■ The fifth factor, renown of the senior mark, is important because (i) a mark must be famous to be protected by the Act's anti-dilution provision, and (ii) the greater the fame of the mark, the greater the likelihood that consumers will make mental associations between the famous mark and similar junior marks. *B.E. Windows Corp.*, 937 F.Supp. at 213 (*citing Mead Data*, 875 F.2d at 1038). Ringling's mark is a famous mark, nationwide.

## 6. Renown of the Junior Mark.

■ This factor is based on the premise that a less renowned junior mark is less likely to dilute and vice versa. *See Clinique*, 945 F.Supp. at 562; *B.E. Windows*, 937 F.Supp. at 214. But for this factor to be meaningful as circumstantial evidence of blurring it is better characterized as the relative fame of the disputed marks or, put another way, the gap in renown between the two marks. The senior mark must be famous to warrant protection under the Act's anti-dilution provision, but even among famous marks there are varying degrees of renown. Thus, for the renown of the junior mark to be meaningful it must be viewed in light of the relative renown of the famous

mark. In other words, the likelihood that a junior mark recognized by 30% of the relevant population will cause dilution by blurring depends on whether the famous mark is recognized by 40% of the relevant population or 90% of that population. Presumably, the potential for dilution is greater where the gap in renown is smaller.

■ Thus, here, in contrast to the fifth *Mead Data* factor, the renown of the famous mark may militate against the likelihood of dilution. Where, as here, the junior mark has been used for a considerable period of time,[30] the likelihood of dilution is greater as the relative renown of the marks approach. Utah's mark is virtually unknown outside of Utah and, given Utah's modest budget for advertising, is likely to remain that way. Yet, Utah's mark is well known within Utah.[31] And, within Utah, the relative renown of the marks is nearly identical—46% of respondents in Ringling's survey completed the incomplete phrase THE GREATEST _____ ON EARTH with SHOW and associated the completed phrase with Ringling, and 45% of respondents completed the phrase with SNOW and associated the completed phrase with Utah. Thus, within Utah the sixth *Mead Data* factor suggests a potential for dilution.

■ Balancing the factors, it is clear that Ringling has not proved by indirect evidence the likelihood of dilution through blurring. The recreational activities covered by the disputed marks are not substantially similar, and their differences are clearly reflected in the marks themselves through the difference in the pivotal terms "show" and "snow". Accordingly, notwithstanding the fame of the marks in Utah, a balancing of the *Mead Data* factors does, not demonstrate that Utah's

30. Courts have correctly observed that the renown of the junior mark will always weigh in favor of a junior mark in the event that this mark identifies a product that has just entered the market unless courts speculate on the expected future renown of the junior mark. *See, e.g., Clinique*, 945 F.Supp. at 563. Thus, this factor has been ignored in a claim alleging dilution caused by a mark covering a new product. *Id.* This issue need not be addressed here, where Utah has used its mark to identify its winter tourism activities continuously for over thirty years.

31. As discussed above, Utah does not target commercial uses of its mark in Utah, but rather on out of state travelers who read ski magazines and buy merchandise from Utah's winter tourism sites. Thus, the inference could be drawn that the renown of Utah's mark in Utah is the result of the presence of the mark on license plates, an allegedly noncommercial use. The question presented by this inference is discussed above, but is not necessary to a resolution of the instant case. *See supra*, note 13.

mark will likely lessen the capacity of THE GREATEST SHOW ON EARTH to distinguish or identify Ringling's circus through blurring. This conclusion is confirmed by the survey results, which show that Utah consumers did not associate the famous mark with Utah's winter tourism opportunities.

In sum, neither Ringling's survey evidence nor a balancing of the *Mead Data* factors demonstrate by a preponderance of the evidence that Utah's mark lessens the capacity of the famous mark THE GREATEST SHOW ON EARTH to identify and distinguish Ringling's circus. Thus, Ringling cannot recover for dilution of its mark under 15 U.S.C. § 1125(c).[32]

Accordingly, judgment for Utah in this matter is granted.

An appropriate judgment will enter.

The Clerk is directed to send a copy of these Findings of Fact and Conclusions of Law to all counsel of record.

---

32. Utah contends that, notwithstanding the presence or absence of dilution through "blurring", an injunction against Utah's use of its mark would give the anti-dilution provision of the Act a "retroactive effect" prohibited by *Landgraf v. USI Film Prods.*, 511 U.S. 244, 268–281, 114 S.Ct. 1483, 1499–1505, 128 L.Ed.2d 229 (1994)(unless statute reflects clear Congressional intent for retroactive application, it cannot (i) impair a right a party possessed when it acted, (ii) increase a party's liability for past conduct, or (iii) impose new duties with respect to completed transactions). Specifically, Utah contends that an injunction would impermissibly deprive it of a property right in the junior mark. Given the conclusion that there is no dilution, the retroactivity issue is not necessary to the resolution of the case.