**NATIONAL BOARD FOR CERTIFICATION IN OCCUPATIONAL THERAPY, INC., Plaintiff**

v.

**AMERICAN OCCUPATIONAL THERAPY ASSOCIATION, et al., Defendants.**

**No. CIV. AMD 97–767.**

United States District Court, D. Maryland.

Sept. 30, 1998.

---

Michael A. Grow, Bryan A. Sims, Evan S. Stolove, Arent Fox Kintner Plotkin & Kahn, Charles J. Steele, Foley & Lardner, John P. McAllister, Groom & Nordberg, Washington, DC, for Plaintiff.

Steven P. Hollman, Hogan & Hartson, Washington, DC, for Defendants.

## MEMORANDUM

DAVIS, District Judge.

This case involves a bitter familial dispute between two prominent national organiza-

tions in the occupational therapy profession. The battle is for control of the authority to define certification standards in the profession. One disputant is the progeny of the other. Plaintiff, the National Board for Certification in Occupational Therapy, Inc., ("NBCOT"), operates a nationally-recognized certification program for licensed occupational therapy practitioners. Defendant, the American Occupational Therapy Association, ("AOTA"), is a member trade association comprised of occupational therapists and occupational therapy assistants.

The dispute centers around NBCOT's decision to establish a recertification program requiring practitioners to disclose illegal behavior. AOTA vehemently opposes this plan. Among other attempts to scuttle the recertification plan, AOTA has petitioned the Patent and Trademark Office to cancel NBCOT's registered certification marks [1] since, without control of the marks, NBCOT's ability to control the certification process would be fatally undermined. Consequently, NBCOT has brought suit asserting the following claims: declaratory judgment as to the validity and enforceability of NBCOT's certification marks (Count I); declaratory judgment as to the ownership of NBCOT's marks and registrations (Count II); declaratory judgment as to alleged violations of the Lanham Act (Count III); unlawful group boycott (Count IV); unlawful attempted monopolization (Count V); certification mark disparagement (Count VI); breach of contract (Count VII); tortious interference with prospective advantage (Count VIII); statutory and common law infringement, counterfeiting, unfair competition, and dilution of trademark (Counts IX–XIII, as counterclaims). Defendants brought several counterclaims, seeking cancellation of NBCOT's trademark registrations (Count I); declaratory judgment as to the invalidity of the marks (Count II); injunctive relief as to the renewal program

(Count III); Lanham Act violations (Count IV); and antitrust violations (Count V).

Pending before the court are NBCOT's and AOTA's cross motions for partial summary judgment. The motions have been exhaustively briefed and no hearing is necessary. For the reasons discussed below, I will grant plaintiff's motion in part, grant defendant's motion in part, and deny both in part. In particular, I am persuaded that NBCOT is entitled to judgment as a matter of law on its principal trademark and contract claims.

## I. FACTS

### A. The Parties

The historical relationship between the parties is critical to an understanding of the current dispute. AOTA was created during World War I and has since served to provide information, publications, and resources for occupational therapists and occupational therapy assistants. In the 1930's, AOTA began certifying occupational therapy practitioners and maintaining a registry of qualified individuals. Concerned about potential antitrust liability for its involvement in certifying practitioners while also providing membership services, AOTA decided to withdraw from all certification activities. It elected to create a separate organization with the power and responsibility of certifying practitioners. Thus, in April 1986, AOTA created the American Occupational Therapy Certification Board ("AOTCB"), an autonomous unit within AOTA with sole responsibility for certifying practitioners. Pursuant to its creation of AOTCB, AOTA transferred relevant certification documents and materials to AOTCB. AOTA then ceased any responsibility for certification. AOTCB existed within AOTA until 1988, when it separately incorporated. At that time, AOTA transferred all of the finances, office equipment, certification records, and test materials to the independent

---

**1.** A certification mark is "any word, name, symbol, or device, or any combination thereof (1) used by a person other than its owner, or (2) which its owner has a bona fide intention to permit a person other than the owner to use in commerce and files an application to register on the principal register established by this chapter, to certify regional or other origin, material, mode

of manufacture, quality, accuracy, or other characteristica of such person's goods or services or that the work or labor on the goods or services was performed by members of a union or other organization." 15 U.S.C. § 1127 (West 1998). NBCOT registered Occupational Therapist, Registered ("OTR") and Certified Occupational Therapy Assistant, ("COTA").

organization. AOTCB renamed itself NBCOT in 1996.

## B. The Marks

AOTA and NBCOT dispute the ownership and rights to use the OTR (Occupational Therapist Registered) and COTA (Certified Occupational Therapist Registered) marks. Initially, AOTA adopted an emblem to symbolize its organization, consisting of a caduceus with the letters OT. This emblem was registered with the Patent Office in 1963 as a collective membership mark; however, such registration expired in 1993. The emblem was redesigned at some point to include the words OTR and COTA. AOTA sold this emblem, on pins and patches, to its members. OTR or COTA certification was required for AOTA membership. Not all certified individuals joined AOTA, however, and these individuals were free to purchase such materials from AOTA with the marks on them.

After the transfer of certification activities, NBCOT applied to register the marks in the Patent and Trademark Office ("PTO"). Registration was granted in 1996. Currently, 38 states require NBCOT certification as a condition of state licensure in the field of occupational therapy.

In 1995, NBCOT and AOTA signed an agreement, denominated "License Agreement." Therein, AOTA acknowledged that NBCOT was the owner of the OTR and COTA marks. Under the terms of the agreement, NBCOT granted a nonexclusive license to AOTA to continue to sell pins, patches and other promotional materials embodying the marks to qualified individuals. The validity and enforceability of this agreement is a focus of conflict between the parties.

## C. The Renewal Certification Program

Since taking over sole responsibility for certification of occupational therapy practitioners, NBCOT has required individuals to renew their certification every five years. In 1996, in response to input from physicians, hospital administrators, and assorted health-related and governmental agencies, NBCOT implemented a revised certification renewal program. Under this new program, all prac-

titioners certified more than five years are required to renew their certification. This renewal requires the disclosure of information about illegal activity, e.g., felony convictions, information which NBCOT has been requiring of all certificants since 1988. A second phase of the program is scheduled to be implemented in 2002 and will require a more comprehensive competency screening process pursuant to as yet undetermined criteria. It is this certification renewal program that has prompted AOTA to petition for cancellation of the marks. Paradoxically, then, AOTA created NBCOT's predecessor in interest and outright granted it the power to conduct all certification activities. Now, since it no longer agrees with NBCOT's actions, it seeks to reorder history in its effort to diminish NBCOT's power.

## II. SUMMARY JUDGMENT STANDARD

Pursuant to Fed.R.Civ.P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a motion for summary judgment, the facts, as well as the inferences to be drawn therefrom, must be viewed in the light most favorable to the nonmovant. *Matsushita Elec. Indust. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). A party moving for summary judgment is entitled to a grant of summary judgment only if no issues of material fact remain for the trier of fact to determine at trial. *Id.* at 587, 106 S.Ct. 1348. A fact is material for purposes of summary judgment, if when applied to the substantive law, it affects the outcome of the litigation. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can

return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir.1991).

A party opposing a properly supported motion for summary judgment bears the burden of establishing the existence of a genuine issue of material fact. *Anderson*, 477 U.S. at 248–49, 106 S.Ct. 2505. The nonmovant "cannot create a genuine issue of fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir.1985). *See O'Connor v. Consolidated Coin Caterers Corp.*, 56 F.3d 542, 545 (4th Cir.1995), *rev'd on other grounds*, 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996). "When a motion for summary judgment is made and supported as provided in [Rule 56], an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in [Rule 56] must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505; *Shealy*, 929 F.2d at 1012.

### III. OWNERSHIP OF THE MARKS

NBCOT seeks a declaratory judgment that it is the rightful owner of the OTR and COTA marks. Both parties seek summary judgment on this claim. Because AOTA has not established a genuine issue of material fact disputing NBCOT's ownership, and because the record establishes as a matter of law NBCOT's ownership of the marks, I will grant summary judgment for plaintiff.

Only the owner of a trademark may register that mark with the Patent and Trademark Office. *See* 15 U.S.C. § 1051(a) (West 1998)("The owner of a trade-mark used in commerce may apply to register his or her trade-mark....."). Therefore, although registration serves as prima facie evidence of NBCOT's ownership of the marks, it is necessary to determine ownership at the time of the registration, not after it. *See* 15 U.S.C. § 1115(a). Thus, the historical facts extant at the time of the transfer of the certification process are dispositive.

■ "A sale of a business and of its good will carries with it the sale of the trade-mark used in connection with the business, although not expressly mentioned in the instrument of sale." *President Suspender Co. v. Macwilliam*, 238 F. 159, 162 (2d Cir.1916), *cert. denied*, 243 U.S. 636, 37 S.Ct. 399, 61 L.Ed. 941 (1917). *See also Speed Prods. v. Tinnerman Prods., Inc.*, 179 F.2d 778, 781 (2d Cir.1949)(finding that when a company's assets were distributed to a new company, which continued in the same business with the same inventory and produced the same products, "the good will... passed with the transfer of the business.").

■ When AOTA decided to abandon its certification responsibilities, it transferred to NBCOT the certification records, financial assets, office equipment, and all of the certification materials; it is manifest that the marks used to designate certification status were transferred as well. Although AOTA has pointed out that even after the transfer its internal policy documents stated that it owned the marks, this argument does not generate a genuine dispute of material fact. The policy referred to by AOTA does not specifically designate the OTR and COTA certification marks as property of AOTA. Rather, the policy declares that AOTA owned its *emblem*, referring to the initial symbol registered in 1963. As the court in *Dial–A–Mattress Operating Corp. v. Mattress Madness, Inc.*, 841 F.Supp. 1339, 1350 (E.D.N.Y. 1994), stated, "the test is simply whether the transaction is such that the assignee can 'go on in real continuity with the past,'" quoting *Merry Hull & Co. v. Hi–Line Co.*, 243 F.Supp. 45, 51–52 (S.D.N.Y.1965). The *Dial–A–Mattress* court found that a transfer of good will of the corporation was assumed when the company transferred the remaining assets to the successor. *Id.*

That reasoning applies with equal force in the case at bar. NBCOT proceeded in continuity with AOTA in its certification procedures. It was not only natural that the required marks be transferred (in that they were bundled with and bound up in the good-will inherent in the certification process), but it was imperative that they be so transferred.

As a matter of law, therefore, NBCOT became the owner at the time of the transfer, was the owner at the time of registration, and I will grant summary judgment for NBCOT on this claim.

## IV. VALIDITY OF THE REGISTRATIONS

 NBCOT seeks summary judgment on its request for declaratory judgment that its marks are valid. Alternatively, AOTA seeks summary judgment on its request to cancel the marks and declare them invalid. Before addressing the validity of the marks, I first discuss NBCOT's contention that AOTA is barred from challenging the marks.[2]

 "Under the doctrine of licensee estoppel a plaintiff-licensee is estopped from contesting the validity of its licensor's marks." *Seven–Up Bottling Co. v. Seven–Up Co.,* 561 F.2d 1275, 1279 (8th Cir.1977). *See also Professional Golfers Assoc. v. Bankers Life & Cas. Co.,* 514 F.2d 665, 670 (5th Cir. 1975)("[T]he licensee has, by virtue of the agreement, recognized the holder's ownership."). AOTA argues that licensee estoppel does not apply to certification marks because such marks cannot be licensed. *See Midwest Plastic Fabricators, Inc. v. Underwriters Laboratories, Inc.,* 12 U.S.P.Q.2d 1267, 1275 n. 6, 1989 WL 274375 (TTAB 1989)("There

can be no licensee estoppel involving a certification mark."), *aff'd,* 906 F.2d 1568 (Fed. Cir.1990). *But see Alflex Corp. v. Underwriters Lab., Inc.,* No. CV 87–3344, 1989 WL 164359, at *5 (C.D.Cal.1989)("As a licensee of UL, Alflex is estopped from seeking cancellation of its licensor's [certification] Mark."), *aff'd without op.,* 914 F.2d 261 (9th Cir.1990), *cert. denied,* 502 U.S. 812, 112 S.Ct. 60, 116 L.Ed.2d 36 (1991).

Contrary to the language used by the parties in their agreement, AOTA is not an authentic "licensee" of NBCOT, in the traditional meaning of the word "license." Rather, AOTA merely contracted with NBCOT for permission to continue to derive revenue from the distribution and printing of items containing the certification mark. Significantly, AOTA is not permitted to use the mark to *certify* individuals, nor can it distribute or authorize the distribution of products to uncertified individuals.[3] As the agreement between the parties comprises more a distribution agreement than a traditional "license," I am persuaded that AOTA is not barred by licensee estoppel from contesting the validity of NBCOT's marks. Accordingly, I will proceed to discuss the validity of NBCOT's marks.

 Although registration of a mark "upon the principal register shall be prima

---

2. NBCOT also argues that AOTA is barred by equitable estoppel from challenging NBCOT's marks. NBCOT's allegation that they "have incurred substantial monetary expenses" [and expended] time in ... controlling the manner in which the Marks have been used does not persuade me that AOTA should be barred as a matter of law from challenging the certification marks.

Furthermore, NBCOT contends that AOTA does not have standing to assert a challenge to the marks. This contention is unavailing. "Any person who believes that he is or will be damaged by the registration of a mark on the principal register" may petition to cancel the registration, 15 U.S.C. § 1064. *Compare American Angus Assoc. v. Sysco Corp.,* 865 F.Supp. 1180, 1182 (W.D.N.C.1993) (adopting a strict standing rule by denying standing to the petitioner who was a "mere competitor" of the registrant) *with Selva & Sons, Inc. v. Nina Footwear, Inc.* 705 F.2d 1316, 1325 (Fed.Cir.1983)(granting standing to any party with a "real interest" in canceling an owner's mark). The purpose of the standing requirement is to eliminate parties

without a sufficient stake or interest in the case. As a party to the agreement underlying the claims in this case, AOTA has standing to challenge the marks. It is readily apparent that there is a likelihood that AOTA will suffer injury in fact—diminished revenues—if it loses the fight with NBCOT over certification standards. Thus, AOTA is more than a "mere competitor," and certainly it is not merely "a meddlesome party." *See Jewelers Vigilance Comm., Inc. v. Ullenberg Corp.,* 823 F.2d 490, 494 (Fed.Cir. 1987).

3. In *Midwest,* the court concluded that licensee estoppel was no bar to a challenge to a certification mark because "of the unique character of a certification mark and the basic difference in concept between a certification mark whose owner is obligated to certify the goods or services of anyone who meets and maintains certain standards and conditions [on the one hand] and a trademark [on the other hand]...." *Midwest,* 12 U.S.P.Q.2d at 1275, n. 6. Similarly here, the concerns reflected in the doctrine of licensee estoppel are not remotely implicated by the contractual relationship between NBCOT and AOTA.

facie evidence of the validity of the registered mark...," the Lanham Act lists justifications for canceling a certification mark. 15 U.S.C. § 1115. Thus, if a registrant "(A) does not control, or is not able legitimately to exercise control over, the use of such mark, or (B) engages in the production or marketing of any goods or services to which the certification mark is applied, or (C) permits the use of the certification mark for purposes other than to certify, or (D) discriminately refuses to certify or to continue to certify the goods or services of any person who maintains the standards or conditions which such mark certifies" the trademark may be canceled. 15 U.S.C. § 1064(5). AOTA claims that the marks should be canceled because NBCOT has used them for purposes other than to certify practitioners, that NBCOT has failed to control the marks in consonance with statutory requirements and that NBCOT did not own the marks at the time of the registration.[4]

NBCOT's certification mark may be held invalid and subject to cancellation if it "permit[s] the use of the certification mark for purposes other than to certify" or "engage[s] in the production or marketing of any goods or services to which the certification mark is applied." 15 U.S.C. § 1064(5)(b)(c). The drafters of this provision intended to "prevent a party from certifying his own goods or services." *In re Florida Citrus Comm.*, 160 U.S.P.Q. 495, 498, 1968 WL 8324 (TTAB 1968). *See also* Trademark Manual of Examining Procedure ("TMEP") 1306.01(a) ("The owner of a certification mark does not produce the goods or perform the services in connection with which the mark is used, and thus does not control their nature and quality.").

AOTA alleges that NBCOT has sanctioned improper use of the marks by permitting the marks to be printed on brochures, pins, patches, and for use in advertising. As a matter of law, however, these activities do not violate § 1064(5). The PTO has clearly recognized that "sometimes the owner/certifier prepares tags or labels bearing the certification mark, which are supplied to the authorized users for attachment by them to their goods or for use in relation to their services. Such a tag or label would be an acceptable specimen." TMEP § 1306.06(c). Thus, NBCOT's activities—in permitting AOTA to issue "tags" to those professionals who had been certified by NBCOT—fall squarely within the permissible ambit of the trademark law. Where evidence showed "no conduct ... other than promotion and advertising, both of which are obviously allowed and used by organizations holding certification marks," cancellation has been refused. *Cf. American Angus Assoc.*, 865 F.Supp. at 1184 (denying standing to the party challenging a certification mark registration, but noting that, in any event, the evidence of advertising and promotion was insufficient to cancel the marks).[5] NBCOT is not certifying its "own products," nor is it allowing noncertified individuals to use the marks. Rather, by allowing AOTA to continue its historical use of the marks on tokens, labels and other goods, it promotes, even if only indirectly, the certification process and advertises its services. Neither goal is inconsistent with the restrictions listed in 15 U.S.C. § 1064(5).

■ AOTA argues that its former use of the marks for collective membership purposes,[6] invalidates them as certification marks. AOTA, however, does not generate a genuine issue of fact in support of this assertion. The facts show that AOTA designed an

---

**4.** I have already concluded that as a matter of law NBCOT's predecessor owned the marks after its separation from AOTA. Thus, this argument need not be addressed.

**5.** In addition, in *Opticians Assoc. v. Independent Opticians*, 734 F.Supp. 1171 (D.N.J.), *rev'd on other grounds*, 920 F.2d 187 (3d Cir.1990), the court noted that the members' marks were incorporated into decals, eyewear, accessories, stationery, business cards, and advertisements, activity consistent with that of certification marks.

Similarly, owners of collective service marks, which serve to "guarantee the quality of service provided by members," have also been permitted to display the marks and tags in shops, on materials, and on other products. *E.g., Professional Golfers Assoc.*, 514 F.2d at 668.

**6.** A collective membership mark is a trademark "used by the members of a cooperative, association, or other collective group or organization." 15 U.S.C. § 1127.

emblem that signified membership in AOTA, and after some time incorporated the words OTR and COTA into those emblems. As a matter of law, the conclusion is inescapable that these modified emblems did not serve as collective membership marks, for the record shows that certified individuals purchased products from AOTA and thereby used the marks, even though they were not members of AOTA. Moreover, AOTA has separate policies detailing the requirements for the use of the OTR and COTA marks, as compared to a policy dealing with the emblem itself. Finally, defendant's counsel conceded at the relevant time that "AOTA had trademarked the symbol which appears on its patches and pins as *evidence of membership*." (emphasis added). This statement distinguishes the symbol, or emblem that AOTA had trademarked in 1963 from the OTR and COTA marks awarded to those who satisfied the requisite standards for certification.

■ AOTA also contends that NBCOT's marks are invalid because NBCOT has failed to exercise proper control over the marks. To succeed on this claim, AOTA "has the burden to demonstrate by a preponderance of the evidence that [NBCOT] failed to exercise control over use of its marks." *Midwest Plastic*, 906 F.2d at 1571. Although the Lanham Act does not define "control," the word has been construed to mean "reasonable control ... as is practical under all the circumstances in the case." *Id.* at 1573. The agreement between the parties requires AOTA to keep records of the manner it uses the marks, *see* Complaint, Exhibit C, ¶ 2, and states that "the nature and quality of products offered under the Marks will be subject to the control of [NBCOT]." *Id.* at ¶ 5. Thus, although AOTA argues that NBCOT executives have failed to monitor AOTA's use and quality of products, these facts fail as a matter of law to demonstrate lack of control. The owner of a certification mark need not control quality 100% in order to withstand cancellation. *See Midwest Plastic*, 12 U.S.P.Q.2d at 1267. The provisions in the parties' agreement, quoted above, and the agreement as a whole, provide a sufficient

mechanism to assure quality control, and sustains NBCOT's claims here. Accordingly, I will grant summary judgment for plaintiff declaring the marks to be valid.

## V. BREACH OF CONTRACT

NBCOT seeks summary judgment on its breach of contract claim. Likewise, AOTA seeks judgment in its favor declaring that the parties' agreement is invalid and in the alternative, that it did not breach the agreement. I first address AOTA's contention that the parties' agreement is invalid and conclude that this argument fails as a matter of law. I then construe the parties' unambiguous agreement as a matter of law; AOTA's breach of the agreement is thereby made patent. Therefore, I will deny AOTA's motion for summary judgment on this issue and grant NBCOT's motion.

■ AOTA argues that the parties' agreement is an assignment in gross that invalidates the agreement. This argument is without merit. An assignment in gross is an impermissible "sale of a trademark divorced from its good will." 2 J.T. McCarthy, *McCarthy on Trademarks and Unfair Competition,* § 18:3, (4th ed.1996). Although a trademark cannot be sold or assigned [7] apart from the good will that it symbolizes, the agreement between AOTA and NBCOT is not such an assignment. It is a form of contract that permits AOTA to use the marks subject to NBCOT's control. AOTA can use the marks on stationery and other items offered for purchase by individuals who have satisfied NBCOT's certification criteria. Since the agreement does not divorce the certification marks from the good will embodied in NBCOT's certification standards and its business name, and corporate identity, AOTA's contention fails to establish the invalidity of the agreement.

AOTA also argues here, as it did above, that certification marks cannot be licensed; thus, it contends, the entire agreement is invalid. As discussed *supra,* however, I conclude as a matter of law that the agreement between AOTA and NBCOT is more akin to

---

**7.** An assignment is defined as an outright sale of the mark, whereas a license is a limited permit

for an individual to use the mark. *See McCarthy on Trademarks,* at § 18:1.

a contract for distribution and printing of promotional materials, than a "license" granting AOTA the power to "use" the certification marks as the marks are genuinely "used": *to certify practitioners of occupational therapy as fully qualified to practice the profession.*[8] There is no legal bar to the arrangement between AOTA and NBCOT. As recognized in *American Angus Assoc.*[9] and by TMEP 1306.06(c), owners of certification marks can engage in promotional advertising in conjunction with their services. Thus, AOTA's argument that the license agreement is invalid fails as a matter of law and its motion for summary judgment is denied as to those grounds.[10]

This conclusion is especially warranted given the historical context of the dispute between the parties, which a rational fact finder could interpret in only one reasonable manner. AOTA sought to avoid the potential for antitrust liability by getting out of the certification business. It did so, and in achieving that goal, it voluntarily relinquished legal control over the marks, which the historical record indisputably establishes were part and parcel of the certification process. To be sure, proposals for recertification programs never garnered majority support in the unified association, just as suggestions for the adoption of similar requirements have often encountered opposition in other fields. (I may take judicial notice, for example, that Maryland remains one of a dwindling number of states lacking a mandatory continuing legal education program.).

Unfortunately for the present leadership of AOTA (and perhaps a sizeable faction of its membership), those in control of the independent certification arm of the profession—NBCOT—have now taken a divergent path in the assessment of what is truly in the best interest of the profession and the consuming public. As a matter of law, AOTA is charged with knowledge of such a possibility when it brought NBCOT's predecessor into existence in 1986. The historical record of the course of dealing between the parties during the early period when AOTA was allowed continued use of the marks consistent with extant certification standards—as memorialized in the parties' 1995 agreement—is plainly a reflection of the hope and expectation that the two organizations would continue to see eye-to-eye on most important matters of mutual concern. The frustration of that shared hope is scant reason to take a revisionist approach to the historical record. I decline AOTA's invitation to recast that record and create a form of uncertainty on the basis of 20/20 hindsight. Accordingly, for all these reasons, the parties' agreement is valid and enforceable. I turn now to the question of its proper interpretation.

Under Maryland law, "where the language of a contract is 'clear and unambiguous, the construction of the contract is a matter of law for the court.'" *Hirsch–Chemie, Ltd. v. Johns Hopkins Univ.*, 36 U.S.P.Q.2d 1395, 1397, 1995 WL 424929 (4th Cir.1995)(citing *Della Ratta, Inc. v. American Better Community Developers, Inc.*, 38 Md.App. 119, 380 A.2d 627, 633–34 (1977)). Thus, when "there is no room for construction, . . . a court must presume that the parties meant what they expressed." *State Dep. of Ec. & Comm. Dev. v. Attman/Glazer P.B. Co.*, 594 A.2d 138, 143, 323 Md. 592, 602 (1991). The parties' agreement states that AOTA would not "contest the validity of the Marks," nor would it "contest [NBCOT's] ownership or the registration of the Marks." The plain meaning of these terms is unambiguous and the court must proceed on the basis that AOTA and NBCOT meant what they plainly expressed. There simply is no genuine dis-

8. In similar contexts, courts have recognized the permissibility of such agreements. In *Professional Golfers*, 514 F.2d at 668, the court stated that "the owner of a collective service mark may license non-members to use the mark under its aegis and subject to proper control." This premise is applicable to certification marks as well, for a "collective trademark bears a very close resemblance to a certification mark." *Opticians Assoc. v. Independent Opticians*, 920 F.2d 187, 193, n. 8 (3d Cir.1990).

9. 865 F.Supp. at 1183.

10. AOTA also argues that because NBCOT did not own the trademarks at the time of the license agreement, it had no power to license the marks to AOTA. As discussed in text, there is no issue of fact as to whether NBCOT owned the marks at the time the certification responsibilities were transferred.

pute of fact as to whether AOTA has contested the validity and the ownership of the marks in contravention of the expressed language of the agreement.[11] Clearly, it has done exactly that.

▮ Furthermore, the agreement provides that AOTA would "limit sale[s] or distribution of products bearing the Marks to persons who are duly qualified to use the Marks." Both parties agree that the meaning of "duly qualified" is unambiguous; however, each party offers its own definition of that term. AOTA argues that "duly qualified" will always mean what it did under the certification standards adhered to by AOTA when it certified individuals or when NBCOT first assumed responsibility for certification. This interpretation is untenable, to say the least. At the time of the execution of the parties' agreement, NBCOT controlled certification standards. AOTA no longer played any role in determining what requirements needed to be fulfilled in order to obtain certification. Consequently, AOTA's attempt to freeze the definition of "duly qualified" is misguided. Moreover, it is manifest that AOTA had no entitlement to any advance notice from NBCOT as to what, if any, changes NBCOT might, in its discretion and in the exercise of its best judgment in the public interest, institute in certification standards. As the organization with sole certification responsibility, NBCOT has the power to create its own certification standards.

Thus, "duly qualified" *must* mean what a "reasonable person in the position of the parties would have meant at the time it was effectuated." *Id.* at 143. In that sense, it must mean, "qualified pursuant to *NBCOT's* standards, present or future." In other words, on this record, as a matter of law, there is only one reasonable interpretation of "duly qualified." Thus, since AOTA has conceded that it has permitted the use of pins

and patches by individuals who are no longer certified under NBCOT's standards, there is no issue of fact as to its breach of contract and summary judgment will be granted for plaintiff.

## VI. TORTIOUS INTERFERENCE WITH PROSPECTIVE ADVANTAGE

AOTA seeks summary judgment on NBCOT's claim that AOTA has tortiously interfered with NBCOT's prospective advantage.[12] NBCOT contends that AOTA has tortiously interfered with its relationships with occupational therapy practitioners by making false statements regarding the ownership of the OTR and COTA marks, and by improperly challenging NBCOT's ownership. I will grant defendant's motion because NBCOT has failed to project evidence sufficient to establish the requisite elements as a matter of law.

There are two branches of tortious interference with business relations recognized in Maryland. *See Natural Design, Inc. v. The Rouse Co.*, 302 Md. 47, 485 A.2d 663 (1984). The first branch creates a cause of action for inducing a breach of contract; the second prohibits wrongful interference with general economic relationships. *Id.* at 674. *See also K & K Management, Inc. v. Lee*, 316 Md. 137, 557 A.2d 965 (1989)(discussing the two types of tortious interference actions). In its complaint, NBCOT does not allege that AOTA induced a third party to breach an existing contract with it, thus, this case falls under the second, broader branch of economic tort.

▮ To prove tortious interference with business relations, NBCOT must show that AOTA committed 1) intentional and willful acts; 2) calculated to cause damage to plain-

---

11. In the agreement, AOTA also acknowledges that NBCOT is the owner of the Marks. It is inexplicable why AOTA would assent to such language other than to concede that it had transferred ownership of the certification marks to NBCOT when it ceased certifying individuals. Although AOTA makes a half-hearted argument that its assent to the agreement was induced by some type of fraud, it has not produced a scintilla of factual support for this contention.

12. In Maryland, claims of tortious interference with prospective advantage and tortious interference with business relations are treated equivalently. *See Bagwell v. Peninsula Reg'l Med. Ctr.*, 106 Md.App. 470, 665 A.2d 297, 313–314 (1995), *cert. denied*, 341 Md. 172, 669 A.2d 1360 (Md. 1996).

tiff in its lawful business; 3) done with an unlawful or improper purpose; 4)that results in actual damages. *See Lee*, 557 A.2d at 973 (citing *Natural Design*, 485 A.2d at 675) (citations omitted). NBCOT "must produce sufficient evidence of all four elements to withstand summary judgment" on this claim. *Henry v. National Assoc. Air Traffic Specialists*, 836 F.Supp. 1204, 1210 (D.Md.1993), *aff'd*, 34 F.3d 1066 (4th Cir.1994).

■ Assuming that NBCOT has established a genuine issue of material fact as to the first three elements, its claim fails because it has not demonstrated the existence of any actual damages caused by AOTA's alleged interference.[13] At bottom, NBCOT merely contends that certain individuals have not renewed their certification and thus, it has lost expected revenue as a result of AOTA's actions. This is insufficient to establish "actual damage and loss resulting." *Henry*, 836 F.Supp. at 1210. No occupational therapy practitioner is under any duty to renew her NBCOT certification; the process is completely voluntary. Moreover, NBCOT has not put forth any facts supporting the inference that this lost revenue was *caused* by AOTA's challenge to its marks, rather than due to the changes in the renewal program itself, or practitioners' personal reasons not to recertify. Although a plaintiff can recover non-pecuniary damages for the tort of intentional interference with business relations, *see Rite Aid Corp. v. Lake Shore Investors*, 298 Md. 611, 471 A.2d 735, 740 (1984), NBCOT still fails in its attempt to demonstrate the existence of any damages caused by AOTA's behavior. Thus, defen-

dant's motion for summary judgment is granted as to this claim.

## VII. NBCOT'S SHERMAN ACT CLAIMS

### A. Group Boycott Claim

■ NBCOT contends that AOTA, together with "John and Jane Does" (unidentified occupational therapy practitioners) have engaged in a group boycott in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1 (West.1998). NBCOT has failed to demonstrate it has access to evidence sufficient to prove this claim. Accordingly, I will grant defendants' motion for summary judgment.

Section one of the Sherman Act prohibits "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States..." 15 U.S.C. § 1. Thus, NBCOT must establish a dispute of material fact tending to show "the existence of an agreement in the form of a contract, combination, or conspiracy that imposes an unreasonable restraint on trade." *Oksanen v. Page Mem. Hosp.*, 945 F.2d 696, 702 (4th Cir.1991), *cert. denied*, 502 U.S. 1074, 112 S.Ct. 973, 117 L.Ed.2d 137 (1992). This section of the Sherman act applies only to "concerted action ... between at least two legally distinct persons or entities." *Id.* at 702. In the alternative, the Supreme Court has recognized that private trade associations are also subject to antitrust scrutiny. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500, 108 S.Ct. 1931, 100 L.Ed.2d 497 (1988).[14]

---

**13.** Defendant also argues that plaintiff's claim fails, as a matter of law, because it is based on a breach of contract. It is well-settled in Maryland that "[t]he defendant's breach of his own contract with the plaintiff is of course not a basis for the tort." *Lee*, 557 A.2d at 974 (citation omitted). *See also Travelers Indemnity Co. v. Merling*, 326 Md. 329, 343 605 A.2d 83, 89 (1992), *cert. denied*, 506 U.S. 975, 113 S.Ct. 465, 121 L.Ed.2d 373 (1992) (stating that the "defendant tortfeasor cannot be a party to the contractual or economic relations with which he has allegedly interfered."). However, this does not dispose of NBCOT's claim. In *Fairfield Six/Hidden Valley Partnership v. Resolution Trust Corp.*, 860 F.Supp. 1085, 1090 n. 7 (D.Md.1994), the court rejected defendant's argument that "because

plaintiffs allege that they had a contract with [defendant]... they cannot assert a claim for malicious interference," for such argument ignores the second branch of the tort.

**14.** Defendant asserts that because plaintiff has failed to identify John and Jane Doe, its claim must be dismissed. *See Sadler v. Rexair, Inc.* 612 F.Supp. 491 (D. Montana 1985) (dismissing plaintiffs' claim merely alleging a conspiracy between defendants and "other debtors," because of its failure to give defendants adequate notice). *Sadler* does not apply here because as a trade association, AOTA is subject to antitrust scrutiny, regardless of the identity of "Jane and John Doe."

The evidence adduced by NBCOT in support of its group boycott claim fails to generate a dispute of material fact as to the existence of a group boycott. Specifically, NBCOT contends that AOTA's publishing of three resolutions that called for the withdrawal of support for NBCOT amounts to a group boycott. These resolutions were *rejected* by the AOTA membership, however, indicating no intention to boycott the organization. In addition, NBCOT argues that a letter sent from AOTA to NBCOT threatened legal action if NBCOT did not change its renewal certification program. This letter merely listed AOTA's possible legal claims, an action which hardly rises to an anticompetitive refusal to deal. *Cf. Federal Trade Comm. v. Superior Ct. Trial Lawyers Assoc.,* 493 U.S. 411, 110 S.Ct. 768, 107 L.Ed.2d 851 (1990)(finding that a concerted decision by trial lawyers to refuse to accept any assigned criminal cases was a restraint of trade in violation of the Sherman Act); *Federal Trade Comm. v. Indiana Fed. of Dentists,* 476 U.S. 447, 106 S.Ct. 2009, 90 L.Ed.2d 445 (1986) (holding that the Federation's explicit policy of refusing to forward x-rays to patients' insurance companies constituted a group boycott).

NBCOT's final piece of evidence in its group boycott arsenal is the allegation that AOTA wrote to its members urging them "to consider... whether OT practitioners should defer submitting their certification renewal applications" to NBCOT. This assertion blatantly misquotes the defendant's letter. The actual content of this letter reads as follows: "We have urged NBCOT to defer the deadline by which applicants must submit their Certification Renewal application forms. We continue to urge NBCOT to reconsider implementation of the program. However, members must decide for themselves the actions they should take." As accurately stated, this letter does not amount to a refusal to deal with NBCOT. Since NBCOT has not projected any substantial evidence to support its group boycott claim, summary judgment for the defendant will be granted.

**B. Attempted Monopolization Claim**

 NBCOT has also failed to project evidence sufficient to establish the elements necessary to satisfy its claim that AOTA is attempting to monopolize the market for occupational therapy certification in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (West.1998).[15] To prove unlawful attempted monopolization, NBCOT must show that AOTA has (1) engaged in predatory or anticompetitive conduct; with (2) a specific intent to monopolize; and (3) a dangerous probability of achieving monopoly power. *See Spectrum Sports v. McQuillan,* 506 U.S. 447, 454, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993). Essentially, an attempt to monopolize requires "methods, means, and practices which would, if successful, accomplish monopolization, and which, though falling short, nevertheless approach so close as to create a dangerous probability of it." *M & M Medical Supplies and Serv., Inc. v. Pleasant Valley Hosp., Inc.,* 981 F.2d 160, 166 (4th Cir.1993)(citing *American Tobacco Co. v. United States,* 328 U.S. 781, 785, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946)).

In order to determine whether defendants have engaged in predatory conduct, the logical place to begin is to "analyz[e] the record to see whether it establishes anticompetitive acts by the defendants." *M & M,* 981 F.2d at 166. NBCOT contends that AOTA's letter to its members and its proposed resolutions demonstrate anticompetitive activity with the sole purpose of attempting to monopolize certification activity. As discussed *supra,* these actions do not establish anticompetitive behavior, or even generate a dispute of material fact thereto.

Moreover, a "plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power." *Spectrum Sports,* 506 U.S. at 455, 113 S.Ct. 884. NBCOT alleges, without elaboration, that the relevant market is occupational therapist certification. Even assuming

15. Although it does appear that AOTA is attempting to regain control over certification procedures, these efforts do not rise to a Sherman Act violation. Rather, they represent a losing battle to control an independent organization of its own creation.

this to be true,[16] NBCOT can not establish that AOTA presents a dangerous probability of success in their attempt to monopolize. This probability must be "substantial and real" and the focus of analysis is on the possession of market share. *M & M*, 981 F.2d at 168. AOTA does not presently certify occupational therapy practitioners. Consequently, it occupies zero percent of the market share for certification. *See M & M*, at 168 (noting that claims alleging less than 30% of the market share should presumptively be rejected).[17] Therefore, although AOTA's conduct appears to be designed to stop NBCOT from instituting recertification practices which the latter plainly has a right to institute, this conduct does not satisfy the requirements for an attempted monopolization claim. Accordingly, defendant's motion will be granted.

## VIII. AOTA'S SHERMAN ACT CLAIMS

### A. Monopolization

NBCOT seeks summary judgment on AOTA's allegations that NBCOT has violated Section 2 of the Sherman Act, 15 U.S.C. § 2 (West.1998). Because AOTA has failed to establish an issue of material fact, I will grant summary judgment to the plaintiff.

 Section 2 of the Sherman Act makes it an offense to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States..." *Id. See also*

*Spectrum Sports*, 506 U.S. at 449, 113 S.Ct. 884. In order to prevail on this claim, AOTA must demonstrate that NBCOT had "possession of monopoly power in a relevant market, willful acquisition or maintenance of that power in an exclusionary manner, and causal antitrust injury." *Advanced Health–Care Servs., Inc. v. Twin County Comm. Hosp.*, 910 F.2d 139, 147 (4th Cir.1990). Defendants claim fails based on insufficient evidence to establish the second and third elements of the claim.[18]

AOTA first cites NBCOT's campaign to convince state legislatures to require NBCOT certification as a prerequisite to state licensure, as a willful acquisition of monopoly power. This action, however, is immune from antitrust liability, pursuant to *Eastern R.R. Presidents Conference v. Noerr Motor Freight*, 365 U.S. 127, 135, 81 S.Ct. 523, 5 L.Ed.2d 464 ("No violation of the [Sherman]Act can be predicated upon mere attempts to influence the passage or enforcement of laws."). *See also Allied Tube*, 486 U.S. at 499, 108 S.Ct. 1931("A publicity campaign directed at the general public, seeking legislation or executive action, enjoys antitrust immunity."). Similarly, AOTA contends that NBCOT's threats to sue individuals who use its registered marks in contravention of the certification requirements also contributes to their acquisition of a willful monopoly. Enforcement of their registered trademark, however, does not amount to evidence of NBCOT's willful acquisition of monopoly power.[19]

16. NBCOT also argues, in its reply brief, that "[as] the only association of occupational therapists, [AOTA's] market power is great." This seems to imply that NBCOT is changing its definition of the relevant market. The remainder of the pleadings and brief focus on the attempt by AOTA to seize control of certification. Thus, I shall assume that certification is the appropriate market.

17. The court in *M & M* notes that strong evidence of the first two prongs can temper a low showing of market share. In this instance, however, the remaining evidence is also weak, thereby further undermining the suggestion that AOTA is attempting to monopolize.

18. I will assume, for purposes of summary judgment, that NBCOT maintains a monopoly of the relevant market. It appears that NBCOT does possess 100% of the market for entry level occu-

pational therapy certification. Although AOTA certifies certain occupational therapy specialists, it is undisputed that this comprises only a minute segment of the certification market. Although AOTA presents no evidence as to why entry level certification is the relevant market, this characterization does not change the ultimate ruling on this issue.

19. In *Clorox Co. v. Sterling Winthrop*, 117 F.3d 50, 56 (2d Cir.1997), the court stated that a trademark agreement which required one company to market its brand under a different mark did not restrict that company from "producing and selling products that compete directly" with that of defendant's. AOTA attempts to distinguish this case from *Clorox* by stating that the plaintiffs in *Clorox* could enter the market and compete using a different trademark. But, the argument goes, this is not the case here because

Finally, even if the foregoing facts established a genuine dispute of fact as to the monopolization claim, AOTA's claim fails because it does not allege any causally related antitrust injury. AOTA alleges that it has suffered injury because it is "precluded from using the marks as it had in the past," and that the occupational therapy profession has been damaged by plaintiff's activities. AOTA has not established any evidence demonstrating that the profession has, in fact, been injured by plaintiff's recertification efforts. Moreover, any restriction on AOTA's use of the marks is a consequence of its *voluntary decision to abandon its certification activities, to incorporate NBCOT, and to execute the parties' agreement,* rather than from any alleged monopoly over certification. Thus, defendant has failed to project evidence sufficient to satisfy the elements of its monopolization claim and summary judgment will be granted for the plaintiff.

### B. Attempted Monopolization

█ The elements of defendant's attempted monopolization claim are very similar to that of its monopolization claim. AOTA must show that NBCOT possessed "1) a specific intent to monopolize the relevant market; 2) predatory or anticompetitive acts in furtherance of the intent; 3) and a dangerous probability of success." *M & M,* 981 F.2d at 166. As discussed above, AOTA has not generated a genuine dispute of material fact as to NBCOT's anticompetitive conduct, for neither its lobbying of state legislature nor its efforts to enforce it trademark establishes such predatory conduct. Thus, like

of "NBCOT's having convinced state legislatures to require NBCOT certification." I am not persuaded. There is nothing barring the formation of another group, which could then lobby state legislatures to accept its certification, under a different registered mark, containing similar standards. The difficulty in doing so does not equate to a legal disability for which compensation may be sought from a competitor.

20. These factors include, but are not limited to a) the degree of inherent or acquired distinctiveness of the mark; b) the duration and extent of use of the mark in connection with the goods or services with which the mark is used; c) the duration and extent of advertising and publicity of the mark; d) the geographical extent of the trading

the monopolization claim, this one fails as a matter of law and summary judgment will be granted to plaintiff.

### IX. FEDERAL TRADEMARK DILUTION ACT CLAIM

Both NBCOT and AOTA argue that they should receive judgment as a matter of law on NBCOT's Federal Trademark Dilution Act claim. I will analyze each party's claim separately.

█ NBCOT claims that there is no dispute of material fact as to AOTA's alleged unauthorized use of the OTR and COTA marks has diluted its trademark. I disagree. Because NBCOT has failed to meet its initial burden to show an absence of material fact, I will deny its motion for summary judgment.

The Federal Trademark Dilution Act of 1996, 15 U.S.C. § 1125(c)(1)(West 1998), states that "the owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark . . . ." The statute sets forth various factors to apply in determining whether a mark is "distinctive and famous." *Id.*[20] Assuming that the OTR and COTA marks are "famous" as defined by the statute,[21] it is necessary to determine if, as a matter of law, such marks are being diluted by AOTA.

area in which the mark is used; e) .the channels of trade for the goods or services with which the mark is used; f) the degree or recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; g) the nature and extent of use of the same or similar marks by third parties; and h) whether the mark was registered under the act of March 3, 1881, or the Act of February 20, 1905, or on the principal register. 15 U.S.C. § 1125(c)(1).

21. NBCOT merely alleges that their marks are "well known in the occupational therapy profession." It is questionable whether this factual assertion itself satisfies the standard required by the party moving for summary judgment.

Dilution is defined as "the lessening of the capacity of a famous mark to identify and distinguish goods or services, regardless of the presence or absence of . . . 2) likelihood of confusion, mistake, or deception." 15 U.S.C. § 1127; *see also Panavision International v. Toeppen,* 945 F.Supp. 1296, 1303 (C.D.Cal.1996), *aff'd,* 141 F.3d 1316 (9th Cir. 1998). Courts have recognized two ways that a trademark can be diluted. *See Ringling Bros–Barnum & Bailey Combined Shows, Inc. v. Utah Div. of Travel Dev.,* 955 F.Supp. 605, 612 (E.D.Va.1997). First, dilution is shown when a "junior mark causes 'tarnishment' of the famous mark." *Id.* Tarnishment occurs when "a famous mark is linked to products of poor quality or is portrayed in an unwholesome manner." *Panavision,* 945 F.Supp. at 1304. *See also Ringling Bros.,* 955 F.Supp. at 614 ("Tarnishing can occur where an accused, junior mark is used on unwholesome or inferior goods or services that may create a negative association with the goods or services covered by the famous mark."). NBCOT alleges that "AOTA's use of the Marks may also tarnish the reputation of NBCOT." This legal conclusion is insufficient to demonstrate the absence of any material fact related to tarnishment.

■ The second type of dilution occurs when "the use of the junior mark causes 'blurring' of the famous mark's power to identify and distinguish goods and services." *Id.* Blurring "involves a 'whittling away' of

the selling power and value of a trademark by unauthorized use of the mark." *Toeppen,* 945 F.Supp. at 1304. *See also Ringling Bros.,* 955 F.Supp. at 616 ("Dilution by blurring . . . occurs where consumers mistakenly associate the famous mark with goods and services of the junior mark."). The determination of "blurring" is a complex issue of fact, as to which NBCOT has not demonstrated a lack of a genuine dispute. Rather, NBCOT simply asserts, conclusorily and without demonstrable factual support, that "AOTA's unauthorized used whittles away at the public's exclusive identification of NBCOT's marks with NBCOT as the certifier and therefore, diminishes the distinctiveness of the marks." This is quite unlike the plaintiffs in *Ringling Bros,* who attempted to show "blurring" of the distinctive quality of their circus slogan with extensive survey [22] and circumstantial evidence.[23]

■ Defendant also argues that it is entitled to judgment as a matter of law because the Dilution Act does not apply to NBCOT's claim.[24] AOTA contends that because it has been using the marks since the 1930's, the Dilution Act does not apply; such application would improperly give the statute retroactive effect.[25] The Fourth Circuit has stated that "absent a clear congressional statement to the contrary, a new statutory provision should not be applied retroactively if in so doing it would impose new legal consequences for events completed before the statute's enactment." *Theard v. Glaxo,*

22. The surveys indicated that "no evidence . . . demonstrates that [the defendant's] use of The Greatest *Snow* On Earth lessens the capacity of The Greatest *Show* On Earth." *Ringling–Bros.,* 955 F.Supp. at 617 (emphases added).

23. The circumstantial evidence examined as part of a balancing test included (1) the similarity of the marks; (2)the similarity of the products covered by the marks; (3) sophistication of consumers; (4)predatory intent; (5) renown of the senior mark; and (6) renown of the junior mark. *Id.* at 618–622.

24. AOTA emphasizes that if summary judgment is not granted in its favor, NBCOT's motion should still not be granted because of the factual issues that remain to be decided.

25. AOTA also argues that the Dilution Act claim should fail as a matter of law because NBCOT is barred by laches. This argument claims that

AOTA has been using the marks in the same way and NBCOT has only recently contested it. This contention mischaracterizes plaintiff's complaint, for AOTA's use only became contrary to the parties' agreement after NBCOT announced its recertification plan and AOTA permitted uncertified individuals to use the marks. Characterized as such, laches plainly does not apply.

AOTA also argues that the Dilution Act should not apply because AOTA's use of the marks predates NBCOT's use and therefore, it does not satisfy the statute's requirement that the "prohibited" conduct begin "after the mark becomes famous." 15 U.S.C. § 1125(c). In actuality, AOTA's unauthorized use did begin after NBCOT made the OTR and COTA marks famous for purposes of certification. Thus, the contention that the Dilution Act does not apply is unavailing.

*Inc.* 47 F.3d 676, 679 (4th Cir.1995)(applying *Landgraf v. USI Film Products,* 511 U.S. 244, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994)). Moreover, there is a split of authority as to whether an award of prospective injunctive relief constitutes a retroactive application of the Dilution Act.[26] It is not necessary, however, to decide this issue because NBCOT's complaint alleges that AOTA's unauthorized use of the trademarks began after 1996. Therefore, retroactivity principles are not implicated by NBCOT's invocation of the Act to AOTA's conduct. Accordingly, defendant's argument that the Act should not apply fails as a matter of law and thus summary judgment in its favor is denied.

## X. CERTIFICATION MARK DISPARAGEMENT

AOTA has moved for summary judgment on NBCOT's claim of certification mark disparagement, or injurious falsehood.[27] Because NBCOT has failed to project evidence sufficient to establish the elements of this claim, I will grant AOTA's motion for summary judgment.

▮▮▮ To maintain a claim for injurious falsehood, NBCOT must establish that AOTA, with malice, published a known falsity to a third party, that caused special damages. *See Horning v. Hardy,* 36 Md.App. 419, 373 A.2d 1273, 1278 (1977). "The plaintiff must prove in all cases that the publication has played a material and substantial part in inducing others not to deal with him, and that as a result he had suffered special damage." *Id.; see also Morrissey v. Morrow & Co.,* 739 F.2d 962, 976 (4th Cir.1984)("[T]he cause of action for injurious falsehood has always required the proof of actual damages."). NBCOT has failed to project evidence sufficient to establish facts to make out these elements. In particular, NBCOT has demonstrated no special damages caused by AOTA's conduct.[28] Because NBCOT fails to "prove special damage, in the form of loss of a present or prospective advantage,"[29] summary judgment will be granted for AOTA. *Morrissey,* 739 F.2d at 976, n. 20 (citing Prosser, W. *Law of Torts,* § 128, 915 (4th ed.1971)).

## XI. NBCOT'S FEDERAL AND COMMON LAW TRADEMARK INFRINGEMENT AND UNFAIR COMPETITION CLAIMS

▮▮▮ NBCOT seeks summary judgment on its federal and common law[30] trademark

**26.** *Compare Viacom, Inc. v. Ingram, Ent.,* 141 F.3d 886, 888–90 (8th Cir.1998) (concluding that application of the Dilution Act to award prospective injunctive relief based on conduct predating effective date of the act is not prohibited); *Fuente Cigar, Ltd. v. Opus One,* 985 F.Supp. 1448 (M.D.Fla.1997)(same) *with Circuit City Stores v. OfficeMax,* 949 F.Supp. 409, 415–16 (E.D.Va.1996)(concluding that prospective relief can only be awarded when the conduct was already illegal at the time of the passage of the new statute; thus, application of the Dilution Act was barred); *Resorts of Pinehurst v. Pinehurst Nat. Dev. Corp.,* 973 F.Supp. 552, 555–60 (M.D.N.C.1997)(adopting the *Circuit City* reasoning), *aff'd in part, rev'd in part on other grounds,* 148 F.3d 417 (4th Cir.1998).

**27.** "[I]njurious falsehood or disparagement [is defined as]... the publication of matter derogatory to the plaintiff's title to his property, or its quality, or to his business in general, or even to some element of his personal affairs, of a kind calculated to prevent others from dealing with him, or otherwise to interfere with his relations with others to his disadvantage." *Horning v. Hardy,* 36 Md.App. 419, 373 A.2d 1273, 1278 (1977)(citing *Beane v. McMullen,* 265 Md. 585, 291 A.2d 37, 49 (1972)).

**28.** Even if NBCOT could establish the elements of its disparagement claim, AOTA could still rely on a conditional privilege, which permits a party to "make statements in the furtherance of one's own self-interest." *See Cambridge Title Co. v. Transamerica Title Ins. Co.,* 817 F.Supp. 1263, 1276 (D.Md.1992), *aff'd without op.,* 989 F.2d 491, 1993 WL 69526 (4th Cir.1993). Thus, as long as AOTA asserted its claim "in good faith," its assertions about mark ownership and validity would be protected.

**29.** I concluded earlier that NBCOT's claim for tortious interference with prospective advantage fails, in part because of its inability to establish any damages caused by AOTA's conduct.

**30.** NBCOT's common law claim of infringement requires a showing of the "use of an appropriated mark without the permission of its owner... [that] is likely to result in or has resulted in confusion, mistake or deception on the part of the consumer." *Brittingham v. Jenkins,* 914 F.2d 447, 455 (4th Cir.1990).

**512**

claims, alleging infringement,[31] counterfeiting,[32] and unfair competition.[33] All of these claims center around the same determination: unauthorized use which "is likely to cause confusion or to cause mistake or to deceive." *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 462 (4th Cir.1996); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 127 (4th Cir.1990)(noting that the "ultimate question, for purposes of determining liability in trademark infringement actions, is whether there exists a likelihood that an appreciable number of ordinarily prudent purchasers will be misled .... ") (citations and internal quotation marks omitted).

The court in *Sara Lee* discussed various factors to consider in determining whether there is a likelihood of confusion. For example, a court should consider "(1) the distinctiveness of the senior mark; (2) the similarity of the two marks; (3) the similarity of the goods or services the mark identifies; (4) the similarity of the facilities employed by the parties to transact their business; (5) the similarity of the advertising used by the parties; (6) the defendant's intent in adopting the same or similar mark; and (7) actual confusion." *Sara Lee*, 81 F.3d at 463. Although the balancing of these significant factors might normally preclude summary judgment, in this case, there is simply no dispute that, as a matter of law, AOTA has infringed NBCOT's certification marks.

AOTA has conceded that it has permitted individuals, who are no longer certified according to NBCOT's present standards, to continue to use the OTR or COTA designation. In addition to breaching the contract with NBCOT, this unauthorized use is no doubt likely to cause confusion. One viewing the marks, in connection with a practitioner, will assume that she has met NBCOT's stan-dards of certification, when in fact, she has not. This is the essence of a likelihood to cause confusion, and therefore, I will grant summary judgment for NBCOT on their trademark infringement claims.

## XII. CONCLUSION

For the reasons set forth above, the parties' motion for summary judgment shall be granted in part and denied in part. An order follows.

---

**31.** 15 U.S.C. § 1114(1)(a) prohibits the unauthorized use "in commerce [of] any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive ...."

**32.** An action for counterfeiting arises when a person, without the owner's consent, "reproduce[s], counterfeit[s], cop[ies] or colorably im-itate[s] a registered mark and appl[ies] such reproduction, counterfeit, copy or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce... which such use is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1114(1)(b).

**33.** 15 U.S.C. § 1125(a) provides a cause of action when one uses a "false designation of origin" or a "false or misleading description ... or misleading representation of fact."